185 N.J. Super. 124 (1981)
447 A.2d 598
STATE OF NEW JERSEY, PLAINTIFF,
v.
HOWARD STROGER, DEFENDANT.
Superior Court of New Jersey, Law Division Morris County.
Decided November 16, 1981.
*126 Peter N. Gilbreth, Assistant Prosecutor, for the State (Peter D. Manahan, Morris County Prosecutor, attorney).
John J. O'Reilly, First Assistant Deputy Public Defender, for defendant.
MUIR, A.J.S.C.
The central issue raised in this matter is whether a panel constituted pursuant to the Supreme Court's authority to discipline members of the bar can voluntarily provide to a county prosecutor records reflecting criminal conduct on the part of an attorney when those records were acquired during the course of an ethics investigation. There are no reported decisions on the issue.
Defendant Howard Stroger, a suspended New Jersey attorney, was indicted for embezzling client's funds in March 1981. The indictment stemmed from records being turned over to the Morris County Prosecutor's Office by Central Ethics pursuant to direction of the Disciplinary Review Board. See R. 1:20.
*127 Stroger moves to "suppress evidence obtained as the result of an illegal search and seizure." His brief in support of the motion essentially urges:
1. An illegal obtaining of evidence by the prosecutor and a breach of the confidentiality requirements of the court rules regulating discipline of state bar members;
2. A violation of defendant's Fourth, Fifth and Sixth Amendment rights, with reliance on Sixth related to failure to provide notice and opportunity to be heard on the turnover.
Sometime in March 1980 complaints were received by Central Ethics concerning Howard Stroger's conduct as an attorney. A demand was made of Stroger by Collette Coolbaugh, Assistant Director of the Administrative Office of the Court in charge of the Division of Ethics and Professional Services, to produce his books and records pursuant to court rule. The date set was March 20, 1980. A new date was set for April 14, 1980 at Stroger's request. It was subsequently reset for May 1, 1980.
On April 11, 1980 Lawrence Litwin, the secretary of the District Ethics Committee, received a letter from Genevieve Radziewicz, executrix of the estate of Robert Paczkowski, complaining about the handling of the estate by Stroger and noting the residuary beneficiary, the Red Cross, had not received its money, approximately $90,000.
Litwin, by letter, assigned the case to Thomas Curtin, an Ethics Committee member, for investigation. At the same time he sent a personal and confidential letter to the Morris County Prosecutor concerning the allegations of the Radziewicz letter, noting that "The Committee brings this matter to your attention inasmuch as there may be criminal overtones." Litwin, due to the "astounding allegations," considered himself obligated by the Canons of Ethics to notify the prosecutor. Before sending his letter to Prosecutor Manahan, he had a conversation about its contents. He later inquired about its receipt.
Thomas Curtin interviewed Mrs. Radziewicz and received from her estate documents, savings accounts and passbooks which were turned over to the prosecutor by Central Ethics on *128 August 4, 1981. After some difficulty he also met with Stroger, at which time he was informed Stroger was being represented by an attorney who had advised him not to discuss the matter. Curtin looked at the trustee account statement of Stroger for March 1980 and, finding a balance of approximately $16,000, asked if client's funds were kept in any other place. Stroger responded in the negative.
Curtin on April 29 prepared an affidavit and filed it with Central Ethics. He provided a copy of the affidavit to Mrs. Radziewicz and Mr. Sprague of the Red Cross. In his cover letter to those people, carbon copies of which went to the prosecutor without the affidavit, he advised both parties to retain attorneys. Mrs. Radziewicz did. She hired attorneys, who instituted proceedings on her behalf which resulted in a settlement. In the verified complaint Mrs. Radziewicz noted her allegations to the Ethics Committee, the appointment of Curtin, Curtin's finding that the trust account statement of Stroger reflected a balance of only $16,000 and Stroger's statement that he maintained no other trustee accounts.
On May 1 Samuel Gerard, an accountant with the Administrative Office of the Courts, visited Stroger's office to audit his records pursuant to the prior demand. Curtin and David Cramp, chairman of the District X Ethics Committee, were present. Gerard requested and Stroger consented, after consulting with his attorney, to turn over for examination the trustee account ledger, bank statements and checks. These records were taken to Trenton and certain of them were subsequently turned over to the prosecutor on October 16, 1981.
On May 1, at about 3 p.m., Stroger was served with an order of the Supreme Court temporarily suspending him from the practice of law, staying disbursements from his trustee and business accounts and requiring him to show cause on May 6, 1980 why the suspension and restraints should not be continued.
On May 6 an order, consented to by Stroger's attorney, was entered continuing his suspension from the practice of law and *129 continuing the restraints on disbursements from his business and trustee accounts.
In May Prosecutor Manahan assigned Assistant Prosecutor Gilbreth to handle the estate matter. An investigator from the office interviewed Mrs. Radziewicz in early June.
On July 2 Gilbreth contacted Miss Coolbaugh and discussed releasing the documents related to the estate matters that Central Ethics had in its possession. Miss Coolbaugh advised that a letter be written requesting the documents, sending a copy to Stroger's attorney. She indicated that if the letter was received on time, she would present the matter to the Disciplinary Review Board at its monthly meeting. On the same date Gilbreth wrote to the Disciplinary Review Board, noting the investigation of the prosecutor's office concerning the conduct of Stroger in the estate of Paczkowski and requesting the forwarding of records, memoranda and documents relating to alleged criminal conduct. The letter also provided that "A copy of this letter is being forwarded to Mr. Stroger's Attorney, Stephen Weinstein ... so that notice of this request is provided."
Weinstein received a copy of the letter. At the suppression hearing Stroger's exercise of the lawyer-client privilege precluded any testimony as to the client's knowledge of the letter. The privilege exercise is noted only for the purpose of reflecting any factual void created by it.
The Disciplinary Review Board met on July 16 and authorized the release of the documents, relying on Regulation 2, Appendix H, recorded in the opinions of the New Jersey Supreme Court Advisory Committee on Professional Ethics. The Board directed Miss Coolbaugh to wait two weeks before releasing the sought materials to give Weinstein an opportunity to respond. There was no response.
On July 22 Investigator Beecher of the prosecutor's office went before a Morris County grand jury for subpoenas. At least one subpoena was issued as result thereof to Monarch *130 Federal Savings & Loan Association where Paczkowski had a savings account, but no evidence of any other subpoenaes issuing was offered by the State.
On August 4 Miss Coolbaugh transmitted documents to Gilbreth. Those documents included the suspension order, the affidavits of Gerard and Curtin, the Radziewicz will, a certificate of letters testamentary, an inventory of safe deposit box, a Transfer Inheritance Tax Bureau executrix' affidavit, an informal estate accounting by Stroger, an affidavit of services to the estate by Stroger, a Transfer Inheritance Tax Bureau statement, a monthly statement of Morris County Savings Bank for the Paczkowski estate for 1978 and a month in 1979, and four savings account books of Robert Paczkowski. Except for the suspension order and two affidavits, all of the documents had been turned over to Curtin by Mrs. Radziewicz.
On July 22 Investigator Beecher again went before a grand jury seeking subpoenas to secure records of Stroger's bank accounts. These records were not sent to the prosecutor on August 4, and shortly thereafter Gilbreth telephoned Miss Coolbaugh when it was realized that the records taken by Gerard on May 1 had not been provided.
Subsequently, on October 16, Beecher picked up bank statements of Stroger's trustee account for the year 1977, April through December for the years 1978, 1979, and January through March for 1980. He also picked up a check book and register for Stroger's business account as well as his trust ledger sheets. Beecher testified he sent a subpoena to Central Ethics as a result of the September 22 authorization by a Morris County grand jury. He had no written record of the subpoena. Miss Coolbaugh testified that to her knowledge all the records provided were not subpoenaed. On the basis of the testimony, I conclude Central Ethics voluntarily provided the records in question.
Pursuant to its attorney disciplinary jurisdiction, the Supreme flCourt in 1978 adopted R. 1:20. Under that rule District Ethics *131 Committees and the Disciplinary Review Board were established.
The District Ethics Committees were authorized through a member to conduct inquiries regarding alleged unethical conduct and to prepare a complaint based upon a recommendation on conclusion of the inquiry.
The Disciplinary Review Board was authorized, among other things, to review pre-complaint determinations by District Ethics Committees and, subject to prior Supreme Court approval, to promulgate regulations governing proceedings before it. R. 1:20-3(c). In May 1979 the Board did enact such regulations. The pertinent one here is Regulation No. 2, entitled "Prosecutor's Duty to Report." It provides, in part: "With the authorization of the Disciplinary Review Board, Central Ethics shall notify the appropriate law enforcement agency of facts which may constitute criminal conduct or other wrongdoing on the part of an attorney."
All proceedings conducted and records made pursuant to R. 1:20 are required to be kept confidential, with certain exceptions. R. 1:20-5(d). None of the exceptions occurred here.
Confidentiality is also required of any Administrative Office of the Court review of bookkeeping records that an attorney is required to keep. In particular, R. 1:21-6(c) indicates that "[w]hen [financial books and other records required to be kept by paragraphs (a) and (b) of the rule] are made available ... all such books and records shall remain confidential except ... for purposes thereof or by direction of the Supreme Court." (Emphasis supplied).
Defendant urges the confidentiality is there to protect him; that it is a bar to voluntary surrender of his records to law enforcement officials.
In light of the contention, analysis of the nature of documents turned over to the prosecutor is pertinent. Some are documents of public record, as the order of suspension, the will and papers related to inheritance tax filings. Some are documents Stroger *132 released to Mrs. Radziewicz during the course of representation. While these documents may have been recovered by the Ethics Committee pursuant to its investigation under R. 1:20, they are not private papers of Stroger or covered by any privilege.
The bank statements and checks of Stroger's trust and business accounts are documents available in possession of third-party banks. See In re Addonizio, 53 N.J. 107 (1968).
Only the trustee ledger cards required to be kept under R. 1:21-6 have any private nature. I note, parenthetically, the confidentiality dictate on these records is to the Administrative Office of the Courts to prevent suggestion of impropriety when an indiscriminate audit takes place. Directive, Administrative Director of the Courts, November 22, 1978.
Whatever the nature of the document, I find the intent of the rule was not to provide protection to an attorney whose conduct may amount to criminal wrongdoing. First, and foremost, is that the conduct of attornies must be circumspect in all ways and that no court rule was, is or ever shall be, designed to provide confidentiality to acts discovered through disciplinary investigations when those acts amount to potential criminal conduct. Second, the Supreme Court promulgated the rule on confidentiality and, at a later time, with its right of imprimatur, gave sanction to the Disciplinary Review Board regulation authorizing release of facts which reflect criminal conduct on the part of an attorney. By that sanction the court made it clear that such information should be provided to law enforcement officials, and the confidentiality provisions of all the rules had to give way to the portent of an attorney's criminal conduct discovered from a disciplinary investigation.
Any other conclusion would create conflict between court rules and disciplinary rules for conduct of attornies, as those rules have been adopted by the Supreme Court. Under DR 1-103, an attorney who learns of misconduct of a fellow attorney is obligated to report it to the appropriate authority. If an ethics committee attorney were not permitted to voluntarily *133 disclose information, as was done here, then he would be obligated to breach the Supreme Court's ethical standards regulating his own conduct.
The suggestion is made that the Disciplinary Review Board refers to disclosure of facts and not records. The records are the facts and the facts are the records. The semantic distinction has no viability and the argument is specious in character.
I find no intent to preclude voluntary disclosure by Central Ethics to the prosecutor of the information gained here, nor to preclude the Ethics Committee members from disclosing the information as they did. Defendant had no reasonable right to expect such nondisclosure.
Turning to the assertion of denial of constitutional rights, the initial analysis must be whether rights of Fourth and Fifth Amendments dimension exist here.
The Fifth Amendment command is that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." That privilege has been identified as a personal one and it inheres basically to the person, not to information that may incriminate. Couch v. United States, 409 U.S. 322, 328, 93 S.Ct. 611, 615, 34 L.Ed.2d 548 (1973). "A party is privileged from producing the evidence but not from its production." Johnson v. United States, 228 U.S. 457, 33 S.Ct. 572, 57 L.Ed. 919 (1913). So, a subpoena compelling the production of the private records of an attorney, where the attorney was not asked to say or do anything, was found not to violate the Fifth Amendment. Andresen v. Maryland, 427 U.S. 463, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976). There the court held that production of personal records is not a violation of the Fifth Amendment when the individual against whom the search is directed is not required to aid in the discovery, production or authentication of incriminating evidence. Id. 427 U.S. at 473-474, 96 S.Ct. at 2745, 49 L.Ed.2d at 638. Stroger was not required to orally authenticate his records under court rule or to answer any questions. He knew this when he indicated that on advice of counsel he would not *134 respond to any questions by Curtin. In light of that knowledge, his subsequent answering of Curtin's question can only constitute a knowing waiver of any protection under Andresen.
Andresen qualifies Spevack v. Klein, 385 U.S. 511, 87 S.Ct. 625, 17 L.Ed.2d 574 (1967), relied upon by defendant, which held that a lawyer could not be compelled to turn over private papers on threat of disbarment when court rule compelled the keeping of those papers. But even if it did not, Spevack is inapposite on its facts to this case. Here bank records are to be kept subject to inspection by and being turned over to the Administrative Office of the Courts. See R. 1:20-5(d)(1) to (5). Stroger, therefore, reasonably should have known his bank records could come into the possession of Central Ethics. He also should have been aware of possible future disclosure.
Possession of documents in the hands of another, such as Central Ethics here, has been a distinguishing factor in applying the Fifth Amendment. So, compelling a taxpayer's attorney to turn over his client's records was not a Fifth Amendment violation. Fisher v. United States, 425 U.S. 391, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976). Papers and records have no constitutional sanctity; compelling production of them by a third party does not involve self-incriminating testimony by their owner. Andresen, 427 U.S. at 477, 96 S.Ct. at 2746. Once those records were made, they were subject to subpoena and there was no Fifth Amendment protection attendant to them. See R. 1:21-6(g). Once those records were turned over to the Ethics Committee, there were no Fifth Amendment rights attendant to prevent their future use against him. Whether the documents were voluntarily turned over, as I have found they properly were, or were subpoenaed, there is no protectable Fifth Amendment right involved.
Implicit in defendant's argument is that in absence of the issuance of a subpoena by a grand jury, the prosecutor had no authority to seek out the turnover of the documents. Although dictum in Brex v. Smith, 104 N.J. Eq. 386, 391 (Ch. 1929), would *135 seem to support that premise, a prosecutor can marshall evidence without first having a grand jury issue subpoenas. See State v. Hilltop Private Nursing Home, Inc., 177 N.J. Super. 377 (App.Div. 1981). Given the authority to marshall evidence, acquisition of evidence by voluntary turnover does not make that evidence illegally acquired. The responsibility to use reasonable and lawful diligence for the detection, arrest, indictment and conviction of offenders of the law, see N.J.S.A. 2A:158-5 (West 1971), logically must include the voluntary acquisition, as here.
The Fourth Amendment command is against unreasonable searches and seizures. The case law on the meanings of that dictate vary in different settings, so dangers exist in the indiscriminate application of cases in one area to those of another. In re Addonizio, supra, 53 N.J. at 123. The inquiry focuses on the protection of people  not places  with intrusion on privacy for a violation to exist. Katz v. United States, 389 U.S. 347, 353, 88 S.Ct. 507, 512, 19 L.Ed.2d 576 (1967).
A person can invoke the Fourth's protection when he can claim a justifiable, a reasonable or a legitimate expectation of privacy that has been invaded by government action. Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). A subjective harboring of an expectation of privacy does not make it a reasonable one. Id. at 743, 99 S.Ct. at 2581.
The facts here do not reflect any privacy that, legitimately and reasonably, in an objective setting, can be considered protectable within the Fourth Amendment. The documents Mrs. Radziewicz turned over to Curtin were not of a nature that gave defendant any reasonable right to expect privacy. The bank records taken on May 1 were subject to review and disclosure under court rules and the Disciplinary Review Board regulations, particularly if criminal implications existed. Additionally, except for the trust account ledger cards, these records were available through the banks. See In re Addonizio, supra, 53 N.J. at 130-132.
*136 It might be argued that the recent decision of our Supreme Court in State v. Alston, 88 N.J. 211 (1981), vitiates in this State the reasonable expectation of privacy concept and establishes a possessory interest as the criterion. I do not read that case as applicable to the circumstances of this case. It dealt with standing to challenge, rather than the substantive nature of Fourth Amendment rights. Further, it involved a search which I do not find exists here.
Here there was a request made for information. Search implies some exploratory investigation and prying into hidden places. State v. Anglada, 144 N.J. Super. 358, 361 (App.Div. 1976). The soliciting of data by the prosecutor pursuant to his powers to marshall evidence, with the voluntary turnover of the data, is not a search. It is not a protectable Fourth Amendment circumstance.
Response is needed to defendant's contention that notice and opportunity to be heard on the turnover of information effectively constituted denial of right to counsel under the Sixth Amendment. In each of the cases cited in support of that proposition, State v. Williams, 80 N.J. 472 (1979); State v. Mingo, 77 N.J. 576 (1978); State v. Kociolek, 23 N.J. 400 (1957), there was an act of court in compelling disclosure information gained by defense counsel as part of the preparation for trial. These cases were considered trespass on effective right to counsel. They are inapposite here. The premise, though not articulated, is, apparently, that since he was not able to argue against the release of the evidence, he was denied counsel. I find no merit in the contention. There is no requirement in the law that a person be given the right to argue against the voluntary turnover of evidence that may be used in future criminal prosecution. There is every reason not to find such a rule of law, particularly when one considers the potential need to keep such a turnover secret to prevent inordinate conduct by an accused.
I conclude the motion to suppress is without merit in all respects and it is denied.