STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
HOWARD STROGER, DEFENDANT-APPELLANT.

Argued October 12, 1983—Decided July 31, 1984.

394

*John M. Apicella,* Assistant Deputy Public Defender, argued the cause for appellant *(Joseph H. Rodriguez,* Public Defender, attorney).

*Carol M. Henderson,* Deputy Attorney General, argued the cause for respondent *(Irwin I. Kimmelman,* Attorney General of New Jersey, attorney).

*William R. Wood* argued the cause for *amicus curiae,* Division of Ethics and Professional Services *(Colette A. Coolbaugh,* Assistant Director, attorney).

The opinion of the Court was delivered by

CLIFFORD, J.

Defendant, Howard Stroger, is a member of the bar of this state. Following the Law Division's denial of his pretrial motion to suppress evidence, 185 *N.J.Super.* 124 (1981), defendant pleaded guilty to embezzlement. With the consent of the State and approval of the trial court, the plea was conditioned on defendant's right to appeal the denial of his motion. The appeal centers around the voluntary transfer by the Disciplinary Review Board (DRB) to a county prosecutor of records tending to demonstrate defendant's guilt of a criminal offense, those records having been acquired in the course of an ethics investigation. Pursuant to Rule 2:12–1 we granted direct certi-

fication of the appeal on the Court's own motion, 93 *N.J.* 321 (1983), and now affirm.

## I

Defendant was retained by Genevieve Radziewicz to represent her in her capacity as Executrix of the Estate of Robert Paczkowski, who died in January 1978. The decedent's estate was valued at $129,000. The will provided Mrs. Radziewicz with a specific bequest of $15,000 and left the residue of the estate to the American Red Cross. After allowance for various deductions and the specific bequest, there remained approximately $84,600 available for the Red Cross.

Considerable delay occurred in the handling of the estate, for it was not until February 1979 that the inheritance tax was paid, the waivers from the Transfer Inheritance Tax Bureau were received, the specific bequest was paid to Mrs. Radziewicz, and the estate bank accounts were closed and deposited in Stroger's trust account. The total deposit to the trust account on February 5, 1979 was $100,999.37, an amount sufficient to pay all outstanding claims, including that of the Red Cross.

During the summer of 1979 Stroger informed Mrs. Radziewicz that the Paczkowski estate had been settled. When Mrs. Radziewicz inquired about the Red Cross's share, defendant told her that the money would be paid when the Red Cross attorneys were satisfied with the accounting. The money never reached the Red Cross, however, because defendant expended it for his personal use, embezzling the funds from his trust account. By 1980 Mrs. Radziewicz's concerns were heightened to the point at which in April she notified the District X Ethics Committee (Committee), whose secretary, Lawrence Litwin, promptly informed the Morris County Prosecutor and the Division of Ethics and Professional Services (DEPS) of the complaint and its criminal overtones.

Coincidentally, in response to unrelated complaints, Colette Coolbaugh, Assistant Director of DEPS, had called upon Stro-

ger to produce for review and audit the records required to be kept by Rule 1:21–6. This request of DEPS was first made on March 12, 1980, before the Radziewicz complaint had surfaced, was repeated on April 18, 1980, and the inspection was finally scheduled for May 1, 1980.

In the meantime, on April 21, 1980, the Committee's Vice-Chairman, Thomas Curtin, who had been assigned to investigate the facts after receipt of the Radziewicz complaint, interviewed Mrs. Radziewicz and obtained from her the informal accounting that Stroger had prepared in the estate matter, the complaint letter, and correspondence with the Red Cross. Curtin thereafter confirmed with the Red Cross that the funds had not been received.

On April 26, 1980, Curtin and a Committee member interviewed Stroger at his office. Stroger said he had retained counsel, who had instructed him not to discuss the substance of the complaint. Stroger showed Curtin his trustee account statement of March 30, 1980, which revealed a balance of about $16,000. When asked by Curtin, Stroger acknowledged that he maintained no other account for client funds.

Curtin thereupon prepared an affidavit reciting the facts uncovered by his investigation, filed the affidavit with DEPS, sent it to Mrs. Radziewicz and the Red Cross, and furnished a copy of his transmittal letter to the Morris County Prosecutor. On the basis of the information contained in the affidavit this Court temporarily suspended Stroger from the practice of law on May 1, 1980. With the consent of Stroger's attorney we entered an order on May 6, 1980, continuing the temporary suspension until resolution of the various ethics complaints.

The inspection of Stroger's records, previously requested by DEPS, took place on May 1, 1980. Present were Stroger, Curtin, Committee Chairman David Cramp, and Samuel Gerard, Chief Accountant for DEPS. After an initial review of Stroger's checks, bank statements, and trust-account ledger book, Gerard asked Stroger's permission to transport those items to

Trenton so he could conduct a more comprehensive examination. Stroger objected at first, but after consulting with his attorney agreed to the removal of the records. Thus on May 1, 1980 DEPS had in its possession Stroger's bank records and his file on the Paczkowski estate (the latter apparently secured by Curtin from Stroger during the May First meeting).

Pursuant to requests made by Assistant Prosecutor Gilbreth, DEPS released most of the foregoing documents and records to the Prosecutor's office in two batches, on August 4, 1980 and October 16, 1980. The August Fourth release was in response to a telephone request from Gilbreth, followed by a letter from Gilbreth dated July 2, 1980 to the DRB asking for "any and all records, memoranda and other documents in [DRB's] possession which contain facts relating to alleged criminality and defalcation" by Stroger. A copy of Gilbreth's letter went to Stroger's attorney "so that notice of this request is provided." On July 16, 1980 DRB, relying on its Regulation 2, granted the Prosecutor's request "if no objection [is] received from [Stroger's attorney] by August 1st." A copy of the DRB's letter to Gilbreth did not go to Stroger or his attorney; and when the August First date passed with no objection to the release of the documents having been received, DRB turned over the following: the informal accounting, the inheritance tax return, Stroger's affidavit of services, correspondence from the Paczkowski file, statements from the Morris County Savings Bank, four savings account books of Robert Paczkowski's estate, the will and letters testamentary, the safe-deposit box inventory, a statement from the Transfer Inheritance Tax Bureau, affidavits of Curtin and Gerard, and the May 6, 1980 Order of Suspension.

After receiving the above, the Prosecutor requested additional documents in the posession of DEPS. Under the authority of DRB's prior order, DEPS transmitted the following records on October 16, 1980: trust-account bank statements from April 1978 to March 1980, trust checkbook and check register, trust-account ledger book, and cancelled checks from Stroger's trust account.

Defendant moved before trial to suppress all the records and documents that he and Mrs. Radziewicz had voluntarily furnished to DEPS and that had, in turn, been released by order of DRB to the Prosecutor. He argued that the release violated the confidentiality requirements of Rule 1:20–5 and Rule 1:21–6, and that he had not received the notice to which he was entitled before the Prosecutor could obtain the records. Stroger further contended that his consent for Gerard to remove records to Trenton was not voluntary because he had not been informed of his right to refuse to relinquish them. Finally, he urged that he had been deprived of his rights under the fourth, fifth, and sixth amendments to the United States Constitution. Following the trial court's denial of Stroger's suppression motion "in all respects," 185 *N.J.Super.* at 136, defendant took this appeal.

II

In 1978 this Court adopted Rule 1:20, which governs the discipline of members of the bar. It is pursuant to Rule 1:20–1 that District Ethics Committees, the DRB, and DEPS have their origin. Those bodies are empowered to conduct inquiries with respect to alleged unethical conduct, and the DRB engages in a review process, all in accordance with Rules adopted by the Court. The functions of those ethical arms of the Court are subject to those DRB regulations, promulgated pursuant to Rule 1:20–3(c), that receive the prior approval of this Court. Of particular significance in this case are the Rules and regulations pertaining to the requirement that attorneys maintain financial records and to the assurance of confidentiality that attaches to those records, as well as to the proceedings conducted pursuant to Rule 1:20.

Rule 1:20–5(d)[1] mandates that "[a]ll proceeding[s] conducted and records made pursuant to R. 1:20 shall be confiden-

---

[1]Rule 1:20–5(d) has since been redesignated as Rule 1:20–10, effective February 15, 1984. Because Rule 1:20–5(d) was in effect at the time of defendant's

tial and shall not be disclosed to or attended by anyone [with certain exceptions]." None of the exceptions applies here. Indeed, the Rule itself does not appear to apply, inasmuch as the "records" that are accorded confidentiality under Rule 1:20–5 are those created in the course of disciplinary matters rather than those business and client records that lawyers are required to maintain in their practice.

The records that defendant seeks to protect as confidential are those bookkeeping records that Rule 1:21–6 requires be kept. More specifically, Rule 1:21–6(a) requires every attorney in the state to maintain trustee accounts separate from, but in addition to, business accounts. Moreover, Rule 1:21–6(b) requires attorneys to maintain for seven years the following bookkeeping records:

(1) the records of all deposits in and withdrawals from the [separate trustee and business] accounts * * * and of any other bank account which concerns or affects their practice of law, specifically identifying the date, source and description of each item deposited as well as the date, payee and purpose of each disbursement; and

(2) an appropriate ledger book, having at least one single page for each separate trust client, for all trustee accounts, showing the source of all funds deposited in such accounts, the names of all persons for whom the funds are or were held, the amount of such funds, the charges or withdrawals from such accounts, and the names of all persons to whom such funds were disbursed; and

(3) copies of all retainer and compensation agreements with clients; and

(4) copies of all statements to clients showing the disbursement of funds to them or on their behalf; and

(5) copies of all bills rendered to clients; and

(6) copies of all records showing payments to attorneys, investigators or other persons, not in their regular employ, for services rendered or performed.[2] [Footnote added.]

---

proceedings, it is that form of the Rule that is discussed for purposes of defendant's claims. However, for an explanation of the significance of the new provisions of Rule 1:20–10, see *infra* at 411–412.

[2]Rule 1:21–6(b) was amended, effective February 15, 1984, to require also the maintenance of the following bookkeeping records:

(7) all bank statements, cancelled checks and duplicate deposit slips; and

Two provisions within Rule 1:21–6 address the confidentiality of these bookkeeping records. Rule 1:21–6(c) provides that the financial books and other records required to be kept for inspection as well as for checks for compliance with the Rule "shall remain confidential except for the purposes thereof or by direction of the Supreme Court and their contents shall not be disclosed by anyone in such a way as to violate the attorney-client privilege." Rule 1:21–6(g) furnishes protection for any of the records required to be kept by the Rule, mandating that although "[t]hey shall be available upon request for review and audit by the Central Ethics Unit * * *, all such records shall remain confidential except for the purposes of the particular proceeding and their contents shall not be disclosed by anyone in such a way as to violate the attorney-client privilege."

■ In seeming opposition to the confidentiality provisions of Rule 1:21–6 is the DRB's Regulation 2, published in the New Jersey Law Journal, 101 *N.J.L.J.* 389, 398 (1978), which, at the time in question, provided in part: "With the authorization of the Disciplinary Review Board, Central Ethics shall notify the appropriate law enforcement agency of facts which may constitute criminal conduct or other wrongdoing on the part of an attorney." Thus, defendant argues that in complying with Regulation 2 and releasing the challenged records to the prosecutor, the disciplinary authorities breached the confidentiality mandates of Rule 1:21–6. We reject this contention and conclude, as did the court below, that the confidentiality requirements of the Rules were not intended to shield a lawyer's unethical or criminal activities. Moreover, the turnover of Stroger's records to the Prosecutor did not amount to a denial

---

(8) copies of all records, showing that at least quarterly a reconciliation has been made of the cash balance derived from the cash receipts and cash disbursement journal totals, the checkbood balance, the bank statement balance and the client trust ledger sheet balances.

These new provisions, which include records not specifically required by Rule 1:21–6(b) as it existed during defendant's proceedings, are discussed *infra* at 412–413.

of due process nor a deprivation of any other constitutional rights.

## III

As a preliminary matter, Stroger contends that the trial court improperly imposed on him the burden of proof on his motion to suppress. Defendant's motion was made pursuant to Rule 3:5–7, based on an assertion that he had been aggrieved by an unlawful search and seizure. The State contends that defendant's voluntary relinquishment to the DRB of his records eliminated any claims of a search or seizure within the meaning of the fourth amendment. Thus, the State maintains that defendant's motion was more appropriately characterized as a pretrial evidentiary motion and that the trial court properly exercised its discretion, pursuant to Evidence Rule 8(1), in determining that defendant should bear the burden of proof.

There is no dispute that defendant was not only required to maintain the records in question, pursuant to Rule 1:21–6, but that he was also required to produce "[a]ny of the records required to be kept by this rule * * * at the direction of the Disciplinary Review Board" and "upon request for review and audit by the Central Ethics Unit." *R.* 1:21–6(g). Moreover, defendant's bookkeeping records are required to be "available for inspection, checks for compliance with this Rule and copying at [the principal New Jersey office of each attorney, partnership, or professional corporation] by a duly authorized representative of the Administrative Director of the Courts." *R.* 1:21–6(c). No warrant is required in such circumstances. In the face of these provisions it can hardly be said that the DRB "searched" and "seized" defendant's records. Defendant knew, or should have known, that his records were subject to open examination. That Stroger understood this is perhaps

best demonstrated by his voluntary relinquishment of the records in question.[3]

Having determined that no "search and seizure" occurred with the DRB's procurement of defendant's records, and that therefore no warrant was required, the trial court was clearly within its authority in casting the burden of proof on defendant pursuant to Rule 8(1). Further, the subsequent delivery to the Prosecutor of defendant's records, in accordance with Regulation 2, did not deprive defendant of a fourth-amendment right. *See* cases cited *supra* note 3.

Defendant also asserts a deprivation of his rights under the fifth amendment, claiming that he was "compelled," under a threat of disciplinary action, to produce his business records.

In this regard Stroger refers to DEPS Assistant Director Coolbaugh's letter of March 12, 1980 (pre-Radziewicz complaint), and her April 18, 1980 letter, demanding production of books and records, in default of which "immediate disciplinary action will be taken against you" pursuant to Rule 1:21-6(h). The protection afforded by the fifth amendment is that "[n]o person * * * shall be compelled in any criminal case to be a witness against himself * * *." *U.S. Const.* amend. V. However, as the Supreme Court noted in *Fisher v. United States,* 425 *U.S.* 391, 96 *S.Ct.* 1569, 48 *L.Ed.*2d 39 (1976), "the Fifth Amendment would not be violated by the fact alone that the papers on their face might incriminate [the party subjected to

---

[3]We note parenthetically that defendant has no basis to raise a claim of fourth-amendment interest in respect of the records obtained directly from Mrs. Radziewicz. *See United States v. Miller,* 425 *U.S.* 435, 443, 96 *S.Ct.* 1619, 1624, 48 *L.Ed.*2d 71, 79 (1976) ("This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed."); *State v. Hunt,* 91 *N.J.* 338, 343–44 (1982) (citing *Smith v. Maryland,* 442 *U.S.* 735, 99 *S.Ct.* 2577, 61 *L.Ed.*2d 220 (1979), for the proposition that a person has no legitimate expectation of privacy in information voluntarily turned over to third parties).

the request for production], for the privilege protects a person only against being incriminated by his own compelled testimonial communications." *Id.* at 409, 96 *S.Ct.* at 1580, 48 *L.Ed.*2d at 55. Thus, there are two factors to be considered in evaluating an assertion of a fifth-amendment privilege: the testimonial nature of the communication, and the existence of compulsion.

In examining the documents in question in light of defendant's asserted fifth-amendment privilege, we are struck at the outset by the fact that these records were required to be kept in accordance with Rule 1:21-6.[4] The rationale behind the required-records exception to the fifth-amendment privilege is that the public interest in obtaining the recorded information far exceeds the private interest militating against disclosure. *See* VIII *J. Wigmore, Evidence* § 2259c (McNaughton rev. 1961). Hence, defendant's business records are not at all of a testimonial or a compelled nature when they are prepared so as to, and in fact do, speak for themselves.

The Supreme Court recently addressed the issue of the applicability of the fifth-amendment protection to the business records of a sole proprietorship, in *United States v. Doe*, —— *U.S.* ——, 104 *S.Ct.* 1237, 79 *L.Ed.*2d 552 (1984). The Court found that when the person whose records have been requested does not claim that he or she prepared the documents involuntarily or that he or she was forced to restate, repeat, or affirm the truth of the records' contents, then the contents of those records are not privileged. *Id.* at ——, 104 *S.Ct.* at 1242, 79

---

[4]Whereas it may be true that Rule 1:21-6(b) does not specifically require defendant to retain cancelled checks, the Rule nevertheless requires that attorneys maintain their financial books and other records "in accordance with generally accepted accounting practice," *R.* 1:21-6(c), and that they maintain "the records of all deposits in and withdrawals from the [attorneys' trustee and business] accounts," *R.* 1:21-6(b)(1). Moreover, the current form of the Rule, as is discussed *infra* at 412–413, now specifically requires the maintenance of "all bank statements, cancelled checks and duplicate deposit slips * * *." *R.* 1:21-6(b)(7). The intent of the recordkeeping requirement leaves little doubt that defendant's fifth-amendment rights were not violated.

*L.Ed.*2d at 560; *accord Shapiro v. United States,* 335 *U.S.* 1, 32–33, 68 *S.Ct.* 1375, 1391–1392, 92 *L.Ed.* 1787, 1807 (1948) (citing *Davis v. United States,* 328 *U.S.* 582, 590, 66 *S.Ct.* 1256, 1260, 90 *L.Ed.* 1453, 1458 (1946), for the proposition that the privilege that exists in respect of private papers cannot be maintained in relation to "records required by law to be kept in order that there may be suitable information of transactions which are the appropriate subjects of governmental regulation and the enforcement of restrictions validly established"); *In re Grand Jury Empanelled March 19, 1980,* 680 *F.*2d 327, 328, 336 n. 15 (3d Cir.1982) (excepting from the court's consideration of the applicability of the protections against self-incrimination afforded by the fifth amendment those records that are required to be kept by law); *see also Spevack v. Klein,* 385 *U.S.* 511, 520, 87 *S.Ct.* 625, 630, 17 *L.Ed.*2d 574, 580 (1967) (Fortas, J., concurring in judgment) (while noting his agreement with the majority's conclusion that the fifth amendment extends its protection to lawyers and that there were insufficient facts presented to warrant full exploration of the required-records issue, Justice Fortas acknowledged that he might not have concurred in the judgment "[i]f this case presented the question whether a lawyer might be disbarred for refusal to keep or to produce, upon properly authorized and particularized demand, records which the lawyer was lawfully and properly required to keep by the State as a proper part of its functions in relation to him as licensor of his high calling * * *."). Nor can Stroger gain any advantage from *United States v. Doe, supra,* —— *U.S.* ——, 104 *S.Ct.* 1237, 79 *L.Ed.*2d 552, in which the act of producing the requested documents was found to be privileged in that the Court considered it potentially testimonial. The party who was the subject of a subpoena would have had to admit that the documents existed, that they were in his possession, and that they were authentic. *Id.* at ——————— & n. 11, 104 *S.Ct.* at 1242–43 & n. 11, 79 *L.Ed.*2d at 560–61 & n. 11. This holding in *Doe* is inapplicable here in that defendant's records were required to be kept and therefore were already

known to exist, thereby removing any notion of compelled testimony through their production.

█ █ The Coolbaugh letters on behalf of DEPS, demanding production of Stroger's books and records, refer to Rule 1:21–6(h), which provides that "[a]n attorney who fails to comply with the requirements of this rule with respect to the maintenance, availability and preservation of accounts and records or who fails to produce such records as required shall be deemed to be in violation of DR 9–102.⁵" (Footnote added). Defendant maintains that the demand contained in the letters was tantamount to giving him the choice between producing incriminating documents, and thereby "waiving" his fifth-amendment rights, and being subject to disciplinary action. He contends that the constitutional invalidity of such an ultimatum was rejected in *Spevack v. Klein, supra*, 385 *U.S.* 511, 87 *S.Ct.* 625, 17 *L.Ed.*2d 574, in which the Court held

> that the Self-Incrimination Clause of the Fifth Amendment has been absorbed in the Fourteenth, that it extends its protection to lawyers as well as to other individuals, and that it should not be watered down by imposing the dishonor of disbarment and the deprivation of a livelihood as a price for asserting it. [*Id.* at 514, 87 *S.Ct.* at 627, 17 *L.Ed.*2d at 577.]

Although it is quite clear that the fifth amendment applies to lawyers, defendant's reliance on *Spevack* is misplaced. That case involved a subpoena issued to an attorney requesting the production of various records, some of which may or may not have been required to be kept pursuant to a rule that the Court characterized as "broad and general." *Id.* at 517, 87 *S.Ct.* at 629, 17 *L.Ed.*2d at 579. By contrast the Rule at issue in this appeal specifies those records that attorneys are required to maintain and produce. *R.* 1:21–6(b). Stroger knew not only what records he had to keep, and in what form, but he knew that he could be audited at any time pursuant to Rule 1:21–6.

---

⁵Disciplinary Rule 9–102 speaks to the requirement that attorneys preserve the identity of funds and property of a client.

Disciplinary Rule 9–102, read in conjunction with Rule 1:21–6, demonstrates the legal profession's intent to ensure that the quality of the profession does not suffer in the eyes of the public. "Like many rules governing the behavior of lawyers, [Disciplinary Rule 9–102] has its roots in the confidence and trust which clients place in their attorneys. * * * It is a trust built on centuries of honesty and faithfulness." *In re Wilson,* 81 *N.J.* 451, 454–55 (1979). Thus, Rule 1:21–6 supplies a means by which attorneys' records can be inspected to determine compliance with the recordkeeping provisions. The requirement of maintaining and producing records cannot be viewed as an unjustified intrusion into attorneys' affairs. Rather, as stated by the Administrative Director of the Courts in a Notice to the Bar:

> An adverse inference should not be drawn from a request by the Central Ethics Unit of the Administrative Office of the Courts that records are to be produced for audit. Most audits will be performed on a random selection basis and will be entirely unrelated to any suggestion of erroneous recordkeeping or failure otherwise to comply with court rules. Compliance audits are being instituted to prevent improper recordkeeping by attorneys and to avoid financial impropriety which may result therefrom. [102 *N.J.L.J.* 489 (1978).]

Accordingly, Stroger's assertion of a denial of his fifth-amendment privilege due to compulsion must fail. Not only does it fail when considered in light of the DRB's demand for *his* records, but it fails with respect to the records received from Mrs. Radziewicz. Although

> [t]he Constitution explicitly prohibits compelling an accused to bear witness "against himself": it necessarily does not proscribe incriminating statements elicited from another. Compulsion upon the person asserting it is an important element of the privilege * * *. It is extortion of information from the accused himself that offends our sense of justice. [*Couch v. United States,* 409 *U.S.* 322, 328, 93 *S.Ct.* 611, 616, 34 *L.Ed.*2d 548, 554 (1973).]

*See also Fisher v. United States, supra,* 425 *U.S.* 391, 96 *S.Ct.* 1569, 48 *L.Ed.*2d 39 (taxpayers could not claim fifth-amendment privilege with respect to documents sought to be obtained from taxpayers' attorneys—taxpayers were not "compelled" to do anything).

 Furthermore, the subsequent delivery of defendant's records to the Prosecutor did not "compel" defendant to be a witness against himself. On this point, Stroger makes an additional contention: the mandates of confidentiality that should be afforded his records were violated. In this regard he relies on Rule 1:20–5(d) ("[a]ll proceeding[s] conducted and records made pursuant to R. 1:20 shall be confidential"), Rule 1:21–6(c) ("[w]hen made available pursuant to this rule, all such books and records shall remain confidential"), and Rule 1:21–6(g) ("[a]ny of the records required to be kept by this rule * * * shall remain confidential [when produced in accordance with the Rule]"). Only sections (c) and (g) of Rule 1:21–6 are pertinent to defendant's records.

 The confidentiality dictates of Rule 1:21–6 must no doubt be respected in the disciplinary system. However, we must not lose sight of the rationale behind this protection. The confidentiality afforded by these Rules is not akin to that accorded privileged communications such as those between attorney and client, or physician and patient—that is, confidentiality in this case is not provided to assure the free flow of information between the parties to the communication. Rather, sections (c) and (g) of Rule 1:21–6 provide for confidentiality to protect the attorney in question from the potential unfavorable inferences that might accompany an ethics investigation. Although defendant contends that the confidentiality is intended to protect his rights by forbidding disclosure of the information contained in his records, it is clear that the recordkeeping requirements, and the attendant system of auditing, are aimed at ensuring compliance—and in fact at detecting noncompliance so that the appropriate disciplinary action may be taken. *See* "Notice to the Bar," *supra,* 102 *N.J.L.J.* 489.

 The complicating aspect of the confidentiality provisions is their interrelationship with the DRB's Regulation 2. This regulation requires DEPS, with the authorization of the DRB, to "notify the appropriate law enforcement agency of

facts which may constitute criminal conduct or other wrongdo-
ing on the part of an attorney." Although defendant maintains
that such disclosure violates the confidentiality assurance of
sections (c) and (g) of Rule 1:21-6, we conclude that these
provisions can and should be read harmoniously. As Judge
Muir aptly noted below, "no court rule was, is or ever shall be,
designed to provide confidentiality to acts discovered through
disciplinary investigations when those acts amount to potential
criminal conduct." 185 *N.J.Super.* at 132.

 In evaluating the validity of a regulation "a court must
determine whether it is consistent with the policy of the legisla-
tion." *In re Barnert Memorial Hosp. Rates,* 92 *N.J.* 31, 39
(1983) (citing *New Jersey Guild of Hearing Aid Dispensers v.
Long,* 75 *N.J.* 544, 562 (1978)). Considering the extensive
monitoring system that this Court has established pursuant to
its disciplinary jurisdiction, it is without question that Regula-
tion 2 advances the policy of maintaining the public's confidence
in the bench and the bar.

 Furthermore, any appearance of a conflict or of an
abuse of the procedures outlined by Rule 1:21-6 and Regulation
2 was obviated in this case by the fact that Stroger *did* receive
notice of the proposed release to the Prosecutor of defendant's
records. Stroger's counsel was sent, and received, a copy of a
letter from the Prosecutor to the DRB. That letter requested
the forwarding of "any and all records, memoranda and other
documents," believed to be in the DRB's possession, that en-
compass facts bearing on defendant's alleged criminal conduct.
In addition, the letter stated that "[a] copy of this letter is being
forwarded to Mr. Stroger's attorney * * * so that notice of this
request is provided." Although defendant received no further
notifications concerning the status of the Prosecutor's request,
it can scarcely be said that the absence of any additional
information was responsible for his failure to have registered
any objection at all. The notice, although not as meticulous as
that required under our current Rules (see *infra* at 411-413,

was more than adequate to alert defendant to the likelihood of the turnover of records to the Prosecutor. Defendant was in no way deprived of the opportunity to object. His claim of a violation of his rights under the sixth amendment is therefore without merit.

## IV

We have determined that the language and intent of the applicable Rules and regulations, as they were in effect at the time of defendant's proceedings, were adhered to by the disciplinary bodies and the Prosecutor. Because several relevant revisions have recently been made to the Rules, we now examine the force that the current form of the Rules lends to our decision.

· Two of the Rules that were affected by the revisions adopted January 31, 1984, to be effective February 15, 1984, were former Rule 1:20–5(d) and Rule 1:21–6. As discussed *supra* at 401, Rule 1:20–5(d) assured confidentiality only to proceedings conducted and records made pursuant to Rule 1:20, with certain exceptions. Although, as we have indicated, *supra* at 401, that Rule cannot be the basis for Stroger's claims based on confidentiality of the information turned over to the Prosecutor, when Rule 1:20–5(d) underwent revision in 1984, it was redesignated as Rule 1:20–10. In addition to protecting the confidentiality of the proceedings and records of disciplinary matters, section (d) of Rule 1:20–10 addresses situations similar to the one at issue here. The first paragraph of Rule 1:20–10(d) provides as follows:

> Whenever an attorney-at-law has been either temporarily suspended from the practice of law or found guilty of unethical or unprofessional conduct as evidenced by the filing of a presentment with the Board and there is evidence of criminal conduct, the Director may refer all documentary information underlying such action, to appropriate law enforcement authorities. Information referred may include but shall not be limited to the names, addresses and telephone numbers of all relevant witnesses that are known, all office work product such as audit reports and statements or testimony by the respondent. Prior to such referral the Director first shall give 10 days written notice to the respondent or counsel, if any, of the intent to make such a turnover. Within

that 10-day period the respondent shall make any application to the Board for a protective order based upon good cause shown.

As is clear from this language of the Rule in its current form, it contemplates Stroger's situation: he was in a temporarily-suspended status; there was evidence of criminal conduct; and DEPS "refer[red] all documentary information underlying such action * * * to appropriate law enforcement authorities." The question is whether the "notice" requirements of the current rule were fulfilled in Stroger's case.

Although Rule 1:20–10(d) now calls for ten-days notice by the Director of DEPS of his intention to release the records supporting a charge of criminal conduct, within which ten-days period a respondent must apply for any protective order, the notice here was given to Stroger not by the Director but by the Prosecutor. The initial request of the Prosecutor was made by letter dated July 2, 1980, with a carbon copy to Stroger's counsel indicating that the letter was to serve as notice of the request. The DRB met and agreed to the release, but conditioned the release on the absence of an objection by August 1, 1980. Although the DRB's action was not communicated to defendant, the fact remains that Stroger did not raise any objection to the proposed order—not only not within the ten-days time allowed by the current Rule, but not within the more than thirty days that elapsed between the Prosecutor's request and the eventual release of the first batch of records on August 4, 1980. Therefore, although it would be stretching things to conclude that the requirements of now-Rule 1:20–10(d) were strictly adhered to, nevertheless we are satisfied that the purposes of that Rule were honored in substance by the notice that was given.

The other Rule revision of interest is that undergone by Rule 1:21–6, the required-recordkeeping provision. Subsection (b) of that Rule was amended to require attorneys to maintain, in addition to the items in the former subsection (b), "all bank statements, cancelled checks and duplicate deposit slips," as well as all records demonstrating at least quarterly reconcilia-

tions of the cash balance derived from various listed documents. *R.* 1:21–6(b)(7), (8). The significance of this amendment is in the requirement that attorneys retain cancelled checks, an item that defendant here argues was not required by former Rule 1:21–6(d). As noted *supra* note 4, Rule 1:21–6(c) then required, as is still required, the maintenance of bookkeeping records "in accordance with generally accepted accounting practice." Moreover, had defendant not produced his cancelled checks, there was sufficient evidence through examination of defendant's trust-account statement to enable Curtin to uncover defendant's defalcation. Curtin's affidavit and the production of defendant's "required records" would no doubt have served as a sufficient basis for the defendant's indictment. Nevertheless, the new provisions of Rule 1:21–6(b), *R.* 1:21–6(b)(7), (8), serve to implement the intent of the Court to require attorneys to have cancelled checks available for review and audit.

V

We conclude that the trial court correctly denied Stroger's motion to suppress the evidence that was obtained by the Prosecutor from the DRB. When, as in this case, records are validly obtained by the DRB in the course of an ethics audit or investigation, and the Prosecutor learns of possible criminal implications in an attorney's conduct, we hold that upon proper notice to the attorney, the DRB does not violate the mandates of confidentiality, nor the attorney's constitutional rights, in the release to law enforcement authorities of the attorney's required records.

We add only that under the circumstances presented the sentence of 180 days in the county jail, which was in accordance with the plea agreement, is not manifestly excessive.

Affirmed.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, SCHREIBER, HANDLER, O'HERN and GARIBALDI—6.

*Not participating*—Justice POLLOCK—1.