569 A.2d 264

NEW JERSEY EXECUTIVE COMMISSION ON ETHICAL STANDARDS, PLAINTIFF–APPELLANT, v. EUGENE J. BYRNE, ESQ., DEFENDANT–RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 3, 1989—Decided January 22, 1990.

Before Judges DEIGHAN, R.S. COHEN and BROCHIN.

*Todd A. Wigder*, Deputy Attorney General, argued the cause for appellant (*Peter N. Perretti, Jr.*, Attorney General, attorney, *Michael R. Clancy*, Assistant Attorney General, of counsel, and *Todd A. Wigder* on the brief).

*Thomas R. Farley* argued the cause for respondent (*Farley, Isles & Codey*, attorneys, *Thomas R. Farley*, on the brief).

The opinion of the court was delivered by

R.S. COHEN, J.A.D.

Defendant Eugene Byrne, a Regulatory Officer employed by the Board of Public Utilities (BPU), received a subpoena to appear before an investigator of the New Jersey Executive Commission on Ethical Standards (ECES). He declined to appear, and ECES applied to the Law Division to enforce the subpoena. *R.* 1:9–6(b). The Law Division denied the application and quashed the subpoena. ECES appealed. We affirm, but for reasons different from those of the Law Division. We hold that the 1987 BPU code of ethics, a possible violation of which was the motivating reason for the ECES investigation

and subpoena, was invalidly adopted, thus gutting the purpose of the investigation.

Some statutory background is necessary. BPU, in one form or another, has regulated public utilities since 1911. *L.* 1911, *c.* 195. In 1948, the former Board of Public Utility Commissioners was made a principal executive branch department called the Department of Public Utilities. *N.J.S.A.* 48:2-1. The Board itself was "continued and is designated the head of such principal department." *Id.* The Governor, who appointed the three commissioners with the advice and consent of the Senate, designated one of the commissioners as President. The President of the board was statutorily empowered to:

be its presiding officer and the chief administrative officer of the Department of Public Utilities. [*N.J.S.A.* 48:2-1.1].

In 1977, the Department of Public Utilities was abolished and its functions, powers and duties were transferred to the Board of Public Utilities, which was established in the Department of Energy; "provided, however, that such board shall be independent of any supervision or control by the department ... except as otherwise expressly provided...." *N.J.S.A.* 52:27F-6(a). All functions, powers and duties of the President and the Commissioners were transferred, without alteration, to BPU. *N.J.S.A.* 52:27F-6(d).

In 1987, the functions, powers and duties of BPU and the positions of President and Commissioners were transferred and continued unchanged "in, but not of" the Department of the Treasury, "independent of any supervision or control by" the Department. *N.J.S.A.* 52:18A-2.1a. The "in, but not of" formula sprang from the constitutional requirement that all executive functions be allocated among 20 principal departments, *N.J. Const.* (1947) Art. 5, § 4, para. 1, and the competing need for agency independence.

Defendant Byrne is a New Jersey attorney, employed by BPU since 1971, first as a Hearing Officer and, since 1978, as a Regulatory Officer. His duties include the drafting of reports,

decisions, orders, rules and regulations for BPU. He also advises BPU on policy matters, reviews initial decisions of administrative law judges, and drafts BPU final decisions.

Since 1972, Byrne has been subject to a BPU code of ethics. In that year, the Board of Public Utility Commissioners adopted a code whose effect, among other things, was to permit attorney employees to practice law except in circumstances that would create a conflict of interest.

In June 1987, the President of BPU adopted and circulated a new code of ethics to be effective July 1, 1987, which provided in Paragraph 4(d):

Commissioners or Board Employees who are attorneys shall not engage in the private practice of law for compensation.

The New Jersey Executive Commission on Ethical Standards was created by the New Jersey Conflicts of Interest Law (COIL) in 1967 and continued by new legislation in 1972. *N.J. S.A.* 52:13D–21. COIL furnishes specific standards to guide the conduct of persons serving in State government, authorizes the various State agencies to adopt codes of ethics designed to meet their specific needs and conditions, and empowers ECES to serve as a disciplinary mechanism. *N.J.S.A.* 52:13D–12. ECES is composed of seven executive branch officers and employees. *N.J.S.A.* 52:13D–21(b). It can "conduct investigations, hold hearings [and] compel the attendance of witnesses and the production ... of ... books and papers," *N.J.S.A.* 52:13D–21(f), and can "initiate, receive, hear and review complaints regarding violations ... of the provisions of [COIL] or of any code of ethics promulgated pursuant to [its] provisions." *N.J.S.A.* 52:13D–21(h). For violation of COIL or an agency code of ethics, ECES may impose a civil penalty of up to $500 and suspend the violator for not more than a year. For willful and continuous disregard of COIL or an agency code of ethics, ECES may terminate the violator's employment and bar him from any public office or employment for up to 5 years. *N.J.S.A.* 52:13D–21(i). In addition, violations of a code of ethics can be cause for removal or other disciplinary action by the

officer or agency having the power of removal or discipline. *N.J.S.A.* 52:13D–23(d).

In early 1989, the President of BPU asked ECES to investigate the possibility that Regulatory Officers were practicing law for compensation in violation of Paragraph 4(d) of the 1987 BPU code of ethics.[1] ECES undertook an investigation. Defendant Byrne received a letter from ECES requesting him to meet with ECES's investigator "to discuss any secondary employment that you might have had since July 1, 1987," the effective date of the new code of ethics. The letter went on to request production of names and addresses of anyone for whom legal services were rendered, and the bank name and account numbers of any trust accounts maintained.

There followed an exchange of correspondence in which ECES and Byrne adopted litigation postures. Finally, ECES issued and served a subpoena on March 29, 1989, for Byrne to appear before the investigator to testify "in the matter of AN INVESTIGATION by virtue of the power vested by ... *N.J. S.A.* 52:13D–21." Byrne was ordered to bring with him his client list since July 1, 1987, his trust bank account number and his "Trust Account Book."[2]

When Byrne did not appear, ECES sought a Law Division enforcement order. *R.* 1:9–6(b). It was denied, and the subpoena was quashed on the ground that, since there was a substantial doubt of the valid adoption of the BPU code of ethics, there was a "serious question as to whether or not the Plaintiff can succeed in utilizing any product of this subpoena...."

---

[1] The record contains neither the request nor the response of ECES. We have only the parties' descriptions of them.

[2] The parties have not dealt with the question whether production of any of this material would create attorney-client confidentiality concerns or, if so, how those concerns might be accommodated. *Cf. R.* 1:21–6(g); *State v. Stroger,* 97 *N.J.* 391, 478 *A.*2d 1175 (1984).

■ In our view, it is clear that the 1987 BPU code of ethics could be adopted only by the Board of Commissioners. Although the President is designated presiding officer and the chief administrative officer of BPU, the powers of that office do not include adoption of a code of ethics that governs the conduct of the Commissioners and agency employees.

According to *N.J.S.A.* 52:13D–23, an agency code of ethics is promulgated by:

[t]he head of each state agency, or the principal officer in charge of a division, board, bureau, commission or other instrumentality within a department of State Government designated by the head of such department....

BPU is a state agency; it is included in COIL's definition which embraces all of the principal executive branch departments or divisions, boards, bureaus, officers, commissions or other instrumentalities within the departments. *N.J.S.A.* 52:13D–13c. COIL defines "Head of a State agency" in the executive branch as the department head. *N.J.S.A.* 52:13D–13d.

It might appear that the State Treasurer, as head of the Department of the Treasury, either adopts a code of ethics for BPU or designates the President as "principal officer in charge" of BPU to do so. Neither of these possibilities is consistent with BPU's statutory function and position. BPU is "in but not of" the Department of the Treasury and is "independent of any supervision or control by the Department." *N.J.S.A.* 52:18A–2.1. It is an independent agency charged with the sensitive function of regulating public utilities, and its essential independence would be compromised if the State Treasurer could impose a code of ethical standards on BPU Commissioners and employees or could grant or withhold permission for BPU to set standards. In fact, the Treasurer has not attempted to exercise such jurisdiction over BPU.

BPU is in a principal department only because the New Jersey Constitution requires all executive functions to be allocated to no more than 20 principal departments. *N.J. Const.* (1947) Art. 5, § 4, par. 1. Other Executive Branch agencies have also been placed in principal departments but expressly

insulated from their supervision and control. Thus placed "in, but not of, the Department of Community Affairs" are the Council on Affordable Housing, *N.J.S.A.* 52:27D–305, the Hackensack Meadowlands Development Commission, *N.J.S.A.* 13:17–5, and the Hackensack Meadowlands Food Distribution Center Commission, *N.J.S.A.* 13:17A–4. The New Jersey Economic Development Agency is "in, but not of, the Department of Commerce and Economic Development." *N.J.S.A.* 34:1B–4. The New Jersey Casino Control Commission and the Casino Reinvestment Development Authority are both "in but not of" the Treasury Department. *N.J.S.A.* 5:12–50; 5:12–153. The Coastal Area Review Board, *N.J.S.A.* 13:19–13, and the New Jersey Wastewater Treatment Trust are both "in but not of" the Department of Environmental Protection. *N.J.S.A.* 58:11B–4. Statutes creating other agencies achieve the same purpose with other language. The Pinelands Development Credit Bank is in the Department of Banking, but is "independent of any supervision or control by the department...." *N.J.S.A.* 13:18A–33. The Violent Crimes Compensation Board and the New Jersey Election Law Enforcement Commission are both allocated within the Department of Law and Public Safety, but, are also "independent of any supervision or control." *N.J.S.A.* 52:4B–3; 19:44A–5. The Pinelands Commission is in but "independent of any supervision or control by" the Department of Environmental Protection. *N.J.S.A.* 13:18A–4.

BPU was not only allocated "in but not of" a department, but was also made "independent of any supervision or control." *N.J.S.A.* 52:27F–6a. The same duplicative language was used with respect to the New Jersey Public Broadcasting Authority. *N.J.S.A.* 52:27H–20.3. *See also N.J.S.A.* 26:2BB–2 (Governor's Council on Alcoholism and Drug Abuse). It represents a double legislative guarantee of the agency's independence and a warning against departmental interference with its function. An agency which is allocated to a principal department in order to satisfy a constitutional requirement, but which is guaranteed independence of the department by the legislation that allocates

it, must, under *N.J.S.A.* 52:13D–23, adopt its own code of ethics without the permission, supervision or control of the head of the principal department.

Thus, it is only the "head" of BPU itself that COIL authorizes to adopt an agency code of ethics. The ECES takes the position that the President as statutory "chief administrative officer" is head of BPU. We think not.

In 1948, when the Department of Public Utilities was created as one of the principal departments, the already-existing Board of Public Utility Commissioners was continued and made "head of such principal department." *N.J.S.A.* 48:2–1.[3] The same legislation simultaneously made the President the chief administrative officer of the department. *N.J.S.A.* 48:2–1.1. Subsequent legislation abolishing the department and transferring the agency to the Department of Energy and then to the Department of the Treasury was careful to maintain intact the functions, powers and duties of the President and the board of commissioners. *N.J.S.A.* 52:27F–6(d); 52:18A–2.1. *N.J.S.A.* 48:2–1.1, which describes the role of the President in the 1948 legislation, remains in force today.

History refutes ECES's argument that the "chief administrative officer" of BPU is the same as the "head of the agency" as COIL uses that phrase. Plainly, when the 1948 Legislature created the Department of Public Utilities and made the board the department head and the President the chief administrative officer, the Legislature envisioned a difference between the two titles and functions. BPU is no longer a department, but the later reorganizations maintained the relationship of the President and board.[4] We thus hold that the board itself remains

---

[3]The 1947 Constitution expressly contemplated legislative designation of a board or commission as the head of a principal department. *N.J. Const.* (1947) Art. 5, § 4, par. 2 and 4.

[4]There is no further legislation or BPU regulation clarifying the administrative functions of the president. Clarification would not be a bad idea.

the "head" of BPU, and was therefore the only proper promulgator of a BPU Code of Ethics.

■ The Attorney General makes a back-up argument. It is that, even if the BPU code of ethics were improperly adopted, the subpoena to Byrne could rest on the broad investigatory powers of ECES. We do not disagree with the general proposition. ECES has broad powers to conduct investigations and hearings on matters beyond specific complaints against particular persons. *N.J.S.A.* 52:13D–21(h) empowers ECES to initiate, receive, hear and review complaints of violations of COIL or any code of ethics promulgated under it. *N.J.S.A.* 52:13D–21(f) separately and independently authorizes ECES to conduct investigations, hold hearings, and compel the attendance of witnesses and production of relevant documents "in order to perform its duties" under COIL. Among those duties are the rendering of advisory opinions, review and approval of state agency codes of ethics, and the recommendation of revisions in codes of ethics and legislation relating to the conduct of executive branch employees. *N.J.S.A.* 52:13D–21(d) and (g).

It is true, as the Attorney General contends, that the general topic of the rendering of legal services for compensation by BPU Regulatory Officers is within the broad investigatory powers of ECES. A subpoena to an appropriate person based on the exercise of those broad investigatory powers would be enforced. *In re Application of Waterfront Com.*, 32 *N.J.* 323, 160 *A.*2d 832 (1960). It is also theoretically possible that defendant Byrne has outside employment that conflicts with his public employment and thus violates ethical standards contained in COIL itself. *N.J.S.A.* 52:13D–23(e). No one, of course, has made that allegation.

It is clear from the correspondence from ECES to defendant Byrne and from the culminating subpoena itself that the ECES investigation was intended to deal only with possible violations of the prohibition of private law practice contained in the 1987 BPU code.

Since ECES's investigation focused only on violations of a code prohibition that was not validly created, we assume that its interest in the matter ceases. ECES could lawfully have chosen a different goal or a wider focus for its investigation, but it did not do so, and we cannot assume that it now presses its subpoena on the thesis that it may well be valid in connection with a hypothetical investigation other than the failed one that prompted its issuance. In addition, there are procedural deficiencies claimed to exist in the subpoena which need not be resolved. If ECES wishes to maintain an investigation within its broad jurisdiction, it can issue a current subpoena to defendant Byrne.

Because of our disposition of this appeal, we need not deal with defendant's various arguments attacking the substantive validity of the code's prohibition against private law practice.

The judgment declining to enforce and quashing the ECES subpoena directed to defendant Byrne is affirmed.