190 N.J. Super. 408 (1983)
463 A.2d 977
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
JAMES EDWARD PIERCE AND CHARLENE CARROLL, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Submitted April 19, 1983.
Decided July 11, 1983.
*409 Before Judges FRITZ and PETRELLA.
Philip S. Carchman, Mercer County Prosecutor, attorney for appellant (William Allan Zarling, Administrative Assistant Prosecutor, of counsel and on the brief).
Merlino, Rottkamp and Flacks, attorneys for respondent James Edward Pierce (Franklin L. Flacks, of counsel and on the brief).
Joseph H. Rodriguez, Public Defender, attorney for respondent Charlene Carroll (Jane G. Kleinfield, Assistant Deputy Public Defender, of counsel and on the letter brief).
The opinion of the court was delivered by FRITZ, P.J.A.D.
This is an automobile search and seizure matter in which we granted the motion of the State for leave to appeal from a determination of the trial judge suppressing the search. We reverse.
*410 The salient facts are not the subject of any real dispute. In any event, the findings of the trial judge in this respect might reasonably have been reached on sufficient credible evidence in the whole record and therefore we accept them. State v. Johnson, 42 N.J. 146, 162 (1964). The trial judge set forth his findings of fact at length, completely and in an articulate fashion.[1] An iteration of these findings will be as useful and more efficient than our restating them:
"... The Court finds the following: That on June 18, 1981 at approximately 1:15 P.M., Troopers William L. Carroll and William Delozier of the State Police, Metro Task Force were on routine patrol on Ferry Street in Trenton. They observed a 1973 Chevrolet automobile, which was double parked in the roadway obstructing traffic by forcing vehicles to proceed around it. This caused a traffic hazzard [sic], in that vehicles coming from the opposite direction were traveling in the same lane of traffic. As a result thereof, the Troopers turned on the overhead lights and had the vehicle pulled over to the side of Ferry Street just a short ways from the next intersection.
Trooper Carroll left his patrol vehicle and approached the driver's side, while his partner Trooper Delozier approached from the opposite side, that is on the passenger's side. At that time the only occupant of the car was the defendant Charlene Carroll. Trooper Carroll then asked the defendant Carroll to produce motor vehicle credentials. As defendant Carroll looked for the documents in her pocketbook, which was located on her lap, Trooper Carroll observed in the open pocketbook a small bulging manila envelope about two inches by three inches in size. Based on his training and experience, which included numerous arrests for Controlled Dangerous Substances, he recognized the package as one commonly used for packaging marijuana and occasionally for the ... packaging of marijuana *411 mixed with PCP. He at that time reached into the purse, seized the envelope. He then smelled it and recognized the odor of marijuana. At that point he asked defendant Carroll what was in the envelope and received no response from the defendant Carroll. At that point he opened the package, examined its contents and found a brownish green vegetation therein, which he believed to be marijuana. The record should, also, note that I find that that package had a piece of tape over the top flap. Miss Carroll was ordered out of the vehicle and advised of her Miranda rights, and she was arrested, handcuffed, and then taken to the rear of that patrol vehicle.
At about this point an unknown male, later identified as the defendant Pierce who was the owner of the car, approached and stated to the troopers, "Hey, man, what are you doing to her? That's my girlfriend." At that point the troopers then began a further search of the front seat area of the car for any additional contraband that he felt may have been in reach of defendant Carroll, that would be the front seat, under the front seat, the glove compartment and, also, any areas in the backseat, which could be reached by him. He found under the passenger seat another small manila envelope, the same type that he had taken from defendant Carroll's handbag. Upon opening that package, the trooper discovered brown vegetation, at which he suspected to be marijuana. The search of the interior of the front part of the vehicle was observed by Pierce, and at the time Trooper Carroll located the envelope, which I just noted, defendant Pierce indicated that a friend of his had left it there. At that point Pierce was advised of his rights, and he was arrested and handcuffed.
While still at the scene, Pierce, after a request by the troopers, executed a written consent to search form, which has been marked S-1, a form which was for the search of his auto, and the results of that search were negative. I find that prior to the time that that S-1 was signed by the defendant Pierce, that he read it, understood it, and was aware of the fact that he did not have to sign it if he did not wish to. I further find that Miss *412 Carroll was transported to the Trenton Police Department. I should say the police station, and as she stepped out of a police vehicle, she was observed by the officer who was with her to have a bag, a brown candy-type bag, fall from beneath her dress and to the ground. This bag was picked up by the officer. Inspection of the bag revealed it contained 20 foil-type packages, which in turn contained a white powder substance, suspected to be Controlled Dangerous Substance.
At the Trenton Police Department a further search of Miss Carroll was conducted by the police matron, a Miss Brown, and as a result of that search a small paper bag was discovered in the area of her right armpit. Examination revealed the contents to be 57 foil packets containing a white powdered substance, also, believed to be a Controlled Dangerous Substance.
A search of Pierce, also, resulted in finding $440 in cash.
Following these events, Patrolman Mansure of the Trenton Police Department informed Detective Snyder of the New Jersey State Police of information which he had learned, and as a result thereof Trooper Snyder contacted the prosecutor on duty here in Mercer County and discussed the situation with him, and he was then instructed  that is Snyder was instructed to contact, to appear before Judge A. Jerome Moore.
Detective Snyder reviewed with Judge Moore the information that he had received, which he believed resulted in him believing that there were monies in the vehicle that had been left on Ferry Street and that those monies were connected with the arrest of the defendants and the controlled dangerous substances, which had been found.
As a result thereof, Judge Moore authorized verbally the impoundment of the car. At that point Detective Snyder then contacted the Trooper and advised him to apply for a search warrant the next day, or in the laternative [sic] to speak with defendant Pierce and attempt to gain from him a consent to a further search of his vehicle.
*413 Shortly after midnight that evening, the vehicle was taken by a local company, towing company, to the Trenton Police Station and was impounded.
On June 19, the day following, Pierce was contacted by the Troopers again, and at that time he was advised that they wished to search his car again. At that time Pierce indicated that there was nothing in the car, that they had searched the previous day. On further insistance [sic] by the officers, Mr. Pierce after reviewing and understanding and comprehending the contents of S-2, he signed S-2, and thereafter the police officers proceeded to search the vehicle again. As I've noted, in this Court's decision I find that the from [sic] S-2 was executed after a reading by Mr. Pierce together with the trooper, a full explanation by Trooper Carroll, and a full understanding by the defendant Pierce as to his rights to refuse to execute and sign the consent form. This decision is not only based on the trooper's testimony, but, also, on the testimony provided in this trial by defendant Pierce. After signing the consent form, Trooper Carroll proceeded to search the trunk and found a large brown bag containing two manila envelopes which in turn contained suspected marijuana. Also, in that small bag was located $9,112 in cash. There were numerous other items in that trunk. However, the items pointed out by the law enforcement officers, as what they considered to be evidence, are two pocket-books, also located in that trunk, which were opened by the officers and found to contain personal papers of the defendant Carroll."
The trial judge identified the "fundamental issues" as:
1. Did Trooper Carroll observe the manila envelope in accordance with the plain view exception to the warrant requirement?
2. And, if so, did he have probable cause to seize and search the manila envelope he observed in defendant Carroll's pocketbook?
Tentatively hypothesizing a determination of these issues favorable to the State, he held the several succeeding searches to be valid except that with respect to the items seized from the trunk of the vehicle, he determined that they "could be used against *414 the defendant Pierce," but because the "consent to search is valid, however, only against the person who gives the consent to search," and inasmuch as "[n]o such consent was requested or given by  requested from or given by defendant Carroll ... the items found in the trunk may not be used against defendant Carroll in any trial of this case, since they were seized without warrant and that there is no exception to the warrant applicable in this case." The State appeals from so much of this determination as relieved defendant Carroll from the effects of the consent search of the Pierce vehicle.
Thereafter the trial judge iterated the conclusions implicit in his findings of fact, i.e., that the trooper had the right to stop the motor vehicle for "violations of the motor vehicle law," and that once he had done that, he had the right to ask for the driving credentials. These conclusions are sound and we confirm them here. With respect to the "fundamental issues," however, the trial judge concluded that despite his findings regarding the recognition by the trooper of "the package as one commonly used for packaging marijuana and occasionally for the ... packaging of marijuana mixed with PCP," the absence of "other factors" present in such cases as State v. Waltz, 61 N.J. 83 (1972), State v. O'Herron, 153 N.J. Super. 570 (App.Div. 1977), cert. den. 439 U.S. 1032, 99 S.Ct. 637, 58 L.Ed.2d 695 (1978) (in which the suppression motion was granted), and State v. Lowry, 95 N.J. Super. 307 (Law Div. 1967), necessitated a conclusion here that the initial search and seizure did not pass constitutional muster. Resisting the argument of the State, repeated here, that a determination such as this completely frustrates the purpose of training and experience in police work inasmuch as it leaves as the only alternative walking away from a conviction that a crime is being committed, the trial judge characterized the trooper's state of mind as "nothing more than an inarticulate hunch." Were this so, his conclusion would be unimpeachable. However, we believe that rejecting the potential of the full reach of an officer's training and experience simply on the basis of the absence of "other factors," such as furtive movements, *415 results in only a superficial application of the test of reasonableness enunciated in the landmark case of State v. Waltz, supra. In a concept undisturbed in more than a decade since its publication, that case instructed:
Probable cause is the minimal requirement for a reasonable search permitted by the Constitution. See Chambers v. Maroney, 399 U.S. 42, 51, 90 S.Ct. 1975, [1981] 26 L.Ed.2d 419, 428 (1970). It is an elusive concept, incapable of being precisely defined. It is more than mere naked suspicion but less than legal evidence necessary to convict. State v. Mark, 46 N.J. 262, 271 (1966); accord State v. Dilley, 49 N.J. 460, 463-464 (1967). It is not a technical concept but rather one having to do with "the factual and practical considerations of every day life" upon which reasonable men, not constitutional lawyers, act. Brinegar v. United States, 338 U.S. 160, 175, 69 S.Ct. 1302, 1310, 93 L.Ed. 1879, 1890 (1949); see State v. Contursi, 44 N.J. 422, 431 (1965). It has been described by this Court as a "well grounded" suspicion that a crime has been or is being committed. State v. Burnett, 42 N.J. 377, 387 (1964). [61 N.J. at 87.]
The State argues, and we wholly agree, that as "other factors" have been held available to test the reasonableness of the suspicions of police officers in those which have become known as the "plain view" cases, the experience and training of an officer should be considered in order to distinguish between the "inarticulate hunch" and the "`well grounded' suspicion that a crime has been or is being committed."
The circumstances of this matter thus viewed, we are persuaded that Trooper Carroll reasonably had probable cause to believe that what he saw represented the ongoing commission of a crime. A state trooper for more than three years, Trooper Carroll was trained at the New Jersey State Police Academy in Sea Girt. There he underwent a 40-hour period of narcotics training and an additional 40-hour period of advanced drug enforcement training. These sessions included training in the identification of controlled dangerous substances and training in the packaging of controlled dangerous substances. He had made more than 300 arrests, 80% of which involved envelopes substantially similar to that in question here. The testimony of the trooper at the suppression hearing translated this training into his convictions. He testified:

*416 Q Now, Trooper, I take it you would concede a manila envelope of that kind could be used for storing of other matters besides Controlled Dangerous Substances; is that correct?
A That's correct.
Q Can you tell the court what it was about this particular manila envelope that led you to believe that it contained Controlled Dangerous Substances?
A Well, the fact is that it was bulging. I mean, it was a solid bulge. It wasn't as if there were coins. It wasn't flat. It wasn't an empty manila envelope. The fact of the type of packaging. Again, if I must describe it, is that the manila envelope, the bulging, the fact that it had a piece of tape across it, all those things in conjunction added to my conclusion.
Q What is the significance of the piece of tape?
A Well, it's a way of containing the brown vegitation [sic]. As I can describe, the vegitation is very loose. It's not like a coin where, you know, in certain instances, you know, it's heavy. It's a heavy-type thing, coins, where you can just turn them over and fall out.
Q Based upon your training and experience then, when you saw this particular envelope in the form that you have described, did you make some determinations about it?
A Yes. I came to the conclusion, based on the points I've stressed, that it contained marijuana.
It is to be remembered that the trial judge acknowledged in his findings of fact the training and experience of the trooper, including "numerous arrests for Controlled Dangerous Substances."
All these things considered we cannot say that the State failed to shoulder its acknowledged burden of demonstrating the existence of probable cause and the reasonableness of this warrantless search. In the "total factual complex," considering the necessity "for a continuing reconciliation of competing values," we are satisfied that "a practical, realistic view of law enforcement, in recognition of the primacy of the individual's right to be safe from attack" must result in a conclusion that the search here was upon a reasonable impression of probable cause rather than an inarticulate hunch. State v. Davis, 50 N.J. 16, 22-25 (1967), cert. den. 389 U.S. 1054, 88 S.Ct. 805, 19 L.Ed.2d 852 (1968). Support for this view is to be found in the recently decided Texas v. Brown, ___ U.S. ___, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983), where the warrantless seizure of a balloon, which proved to contain narcotics, was found justified on the basis of *417 the previous experience of the officer in arrests for drug offenses. There the court iterated a time-honored yardstick:
As the Court frequently has remarked, probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 US 132, 162, 69 L Ed 543, 45 S Ct 280 [288] (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required. Brinegar v United States, 338 US 160, 176, 93 L Ed 1879, 69 S Ct 1302 [1311] (1949). Moreover, our observation in United States v Cortez, 449 US 411, 418, 66 L Ed 2d 621, 101 S Ct 690 [695] (1981), regarding "particularized suspicion," is equally applicable to the probable cause requirement:
"The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same  and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."
[___ U.S. at ___, 103 S.Ct. at 1543, 75 L.Ed.2d at 514.]
Accordingly, we answer the inquiries posed upon the identification by the trial judge of the "fundamental issues" in the affirmative and reverse the determination that the search and seizure of the manila envelope was constitutionally unsound and was to be suppressed.
On the other hand, in view of the constraints imposed by State v. Alston, 88 N.J. 211, 228 (1981), where it is held that "a criminal defendant is entitled to bring a motion to suppress evidence obtained in an unlawful search and seizure if he has a proprietary, possessory or participatory interest in either the place searched or the property seized," we are in turn constrained to affirm the determination of the trial judge that the items seized from the trunk of the vehicle "may not be used against defendant Carroll in any trial of this case" substantially for the reasons set forth by the trial judge in his oral opinion.
Affirmed in part and reversed in part, consistent with the foregoing. We remand for trial.
NOTES
[1] In fact, it is appropriate to note here that the entire oral opinion of the trial judge represents a fine example of professionalism. Not only are the facts specifically found, but the contentions of the parties are reported and the law is discussed at length. We do not hesitate to criticize when a trial judge does less. We believe that recognition of judicial competency is equally proper.