224 N.J. Super. 221 (1988)
540 A.2d 196
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
LOUIS A. THOMAS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted November 24, 1987.
Decided January 14, 1988.
*223 Before Judges MICHELS, SHEBELL and ARNOLD M. STEIN.
Alfred A. Slocum, Public Defender, attorney for appellant (Alan I. Smith, Designated Counsel, on the brief).
W. Cary Edwards, Attorney General, attorney for respondent (Debra G. Lynch, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by ARNOLD M. STEIN, J.S.C., (temporarily assigned).
Defendant was convicted of the murder of Vanessa Ward, N.J.S.A. 2C:11-3a(1) or (2) (count one); possession of a knife for an unlawful purpose, N.J.S.A. 2C:39-4d (count two); and possession of a knife for a purpose not manifestly appropriate for such lawful use as it may have, N.J.S.A. 2C:39-5d (count three).[1] The death-qualified jury did not return the death penalty. Thereafter, the trial judge sentenced defendant to life imprisonment for the murder count, with a parole ineligibility term of thirty-two years. On the second count, defendant was sentenced to a five-year concurrent term. Count three was merged with count two. The judge also imposed VCCB penalties in the amount of $10,025.
On July 3, 1984, at 11:04 a.m., the Hillside police received a telephone call from the victim requesting an ambulance. We reproduce this call, a tape recording of which was played for the jury over objection:
Hillside: Hillside Police and Fire.
Caller: Ambulance, heavy breathing.
Hillside: Hello.
Caller: I need an ambulance.

*224 Hillside: What?
Caller: I need an ambulance.
Hillside: Where at?
Caller: 1454 Leslie Street.
Hillside: 1454?
Caller: Yes, hurry.
Hillside: What's your name?
Caller: Vanessa.
Hillside: Vannessa what?
Caller: Ward.
Hillside: Ward?
Caller: Yes, yes.
Hillside: 1454 Leslie?
Caller: Yes.
Hillside: What floor?
Caller: Second.
Hillside: Second floor and your name is Vanessa what?
Caller: Ward.
Hillside: Ward?
Caller: Yeah.
Hillside: All right. We'll have an ambulance over in a few minutes.
Caller: Hurry.
The police responded promptly. Vanessa Ward, still alive, was lying in the hallway. The injuries were massive. Her left arm was almost severed. There were multiple cuts about her face, neck, right rib and left breast, and multiple defense wounds on her hands, arms and forearms. She was losing air from the neck and rib wounds, which were foaming with blood and other bodily fluids.
At the request of Detective David Drescher of the Hillside police, Linda Voelker-Geiger, a mobile intensive care unit nurse, asked Ms. Ward who had assaulted her. Over objection, Voelker-Geiger testified that Ward responded, "Rasheem;" that "Rasheem" was Louis Thomas; that he was nineteen years old, defendant's then age; and that he lived at 132 Keer Avenue, defendant's address. The admissibility of these utterances is not raised as a ground of appeal. Ward was taken to University Hospital, Newark, where she died approximately one and one-half hours after admission.
*225 During a search of the Ward apartment by Detective Drescher, he noticed that one of two knives was missing from a Wilkinson knife holder. This knife was found on the floor of a bedroom closet about four months later, by Joe Ward, Jr., Vanessa's brother. The knife was bent and had blood stains on the blade. According to testimony produced at trial, it was capable of inflicting all of the wounds found on the victim's body.
On July 4, the day following the killing, Detective John Kulvicki, also of the Hillside police, spoke with Arthur Higgins, defendant's brother-in-law, at the Hillside police station. Defendant formerly resided at the Higgins's apartment but had moved out about one month earlier, leaving some clothes behind. He no longer possessed a key to the apartment. According to Higgins, defendant stopped at his apartment on July 3, 1984, between 11:00 a.m. and noon, and called up to Higgins from the street. Higgins looked out the window and threw a set of keys to defendant. When defendant entered the apartment, he went directly to the bathroom, where he remained for approximately fifteen minutes. He then went to a closet and obtained fresh clothes. Defendant went to the bathroom for a second time. He then emerged and, without comment, deposited a plastic garbage bag next to a couch in the living room, and departed.
Higgins read and signed a consent form permitting a search of the apartment. He was specifically advised that he did not have to consent to a search of his premises. According to Higgins, defendant made no comment when he left the garbage bag in the living room. The bag contained sneakers, blue jeans, a tan shirt, a blue jacket, a white hat and a newspaper dated July 3, 1984. A black four-inch knife, a watch and rings were found in the back pocket of the jeans. Most of the clothes were saturated with blood. According to testimony at the trial, the knife was capable of inflicting all but one of the wounds found on the victim's body. A motion to suppress the garbage bag and its contents was denied.
*226 Defendant had dated Ward for about two or three years. According to her mother, the victim was dating another young man at the time of the incident.
Defendant took the stand. He claimed self-defense. According to him, he and Vanessa Ward were getting along well and had even made love on the morning of her death. A vaginal smear test confirmed the presence of semen. He claimed that he and Ward began to argue because she had expressed an interest in dating another man. Defendant claimed that when the argument escalated, the victim grabbed a knife from the kitchen and began to poke it at him. He was able to wrest the knife from the victim, who then obtained a rifle from a closet. Defendant followed Vanessa into the bedroom, and took the gun from her. Vanessa then picked up the knife again, defendant seized it from her and stabbed her several times. He had no recollection of how many times he had stabbed her. Defendant testified that he hid the knife, called an ambulance, and returned the rifle to a closet. He then fled the apartment.
Defendant contends that the final supplemental charge to the jury was misleading. On the second day of deliberations, the jury requested that the definitions of "purposely" and "knowingly" be repeated. Defendant contends that the following language in the court's recharge blurred the distinction between murder and aggravated manslaughter:
I think in a sense the thing which distinguished the purpose from the knowing is that purposeful is what a person wants to have happen. It's his conscious object to cause it, whereas in a knowingly it's something he's aware of the happening. He knows it's going to happen. He doesn't necessarily wish it.
Do you understand that?
Purposeful, it's my purpose to bring something about. It's what my real wish is for me to do in my mind. Knowingly is what I know will happen, not necessarily intending, but I know it could happen if I do certain things.
We are satisfied that an examination of the complete instruction given by the trial judge refutes this contention of confusing language. Portions of a jury charge alleged to be erroneous should not be read in isolation. The charge must be *227 examined as a whole to determine its over all effect. State v. Wilbely, 63 N.J. 420, 422 (1973). The jury was given the following instruction in response to its question:
The nature of the purpose or knowledge with which the defendant acted toward the decedent is a question of fact for the jury to decide. Purpose and knowledge are conditions of the mind which cannot be seen and can only be determined by inferences from conduct, words or acts. It is not necessary for the State to produce a witness or witnesses who could testify that the defendant stated, for example, that his purpose was to cause the death or serious bodily injury resulting in death; or that he knew that what he was doing would kill the victim or was practically certain to cause the victim's death or serious bodily injury resulting in death.
It is within the power of the jury to find that proof of purpose or proof of knowledge has been furnished beyond a reasonable doubt by inferences which may arise from the nature of the acts and circumstances surrounding the conduct under investigation. Such things as the place where the acts occurred, the weapon used, the location, the number and nature of the wounds inflicted, and all that was done or said by the defendant preceding, connected with and immediately succeeding the events leading to the death of the decedent are among the circumstances to be considered.
Here's what I'm looking for. Okay. A person who commits a killing does so purposely when it is his conscious object to cause death or serious bodily injury resulting in death. It must be one's conscious object. It must be what the person has in mind to do to bring about the death or injury resulting in death. That would be purposely killing.
A person who commits a killing does so knowingly as contrasted to purposely when he's aware, when he knows, that what he's doing will cause death or serious bodily injury resulting in death, and is practically certain to cause death or serious bodily injury resulting in death.
I think in a sense the thing which distinguished the purpose from the knowing is that purposeful is what a person wants to have happen. It's his conscious object to cause it, whereas in a knowingly it's something he's aware of the happening. He knows it's going to happen. He doesn't necessarily wish it.
Do you understand that?
Purposeful, it's my purpose to bring something about. It's what my real wish is for me to do in my mind. Knowingly is what I know will happen, not necessarily intending, but I know it could happen if I do certain things.
In either case, whether the killing is committed purposely or knowingly causing the death of or serious bodily injury must be within the design or contemplation of the defendant. In either case, whether you're talking about knowingly or purposely, it must be within the design or the contemplation of a defendant.

*228 Design would mean in some respect, within the plan of the mind, the thinking of a defendant. Either way. It must be within the design or contemplation of the defendant to be either purposeful or knowing.
Okay?
Need not be both, by the way. One or the other is what the statute says.
Read in its entirety, we do not agree that the language in the supplemental instruction could cause the jury to believe that reckless conduct (N.J.S.A. 2C:2-2b(3) and 2C:2-3c) was the same as knowing or purposeful conduct (N.J.S.A. 2C:2-2b(1) and 2C:2-3b). The trial judge correctly defined purposely and knowingly, and emphasized that in order for a person to act purposely or knowingly, the actual result must be within the defendant's design or contemplation. N.J.S.A. 2C:2-3b. The instruction was not misleading.
We see no merit in defendant's contention that he was entitled to a "diminished capacity" instruction that if he suffered from mental disease or defect, his killing of Vanessa Ward could not be knowing or purposeful. N.J.S.A. 2C:4-2. Defendant was required to show that he suffered from a mental disease or defect that is relevant to the mental state of the offense. No proof was submitted to demonstrate that defendant was afflicted with such a disease or defect, one which rendered him incapable of forming the mental state required to commit the crime of murder. State v. Breakiron, 108 N.J. 591 (1987).
Defendant contends that the prosecutor improperly used the jury selection process to systematically exclude blacks from the jury, in violation of his rights under N.J. Const. (1947), Art. I, ¶¶ 5, 9 and 10. State v. Gilmore, 103 N.J. 508, 517 (1986). The record does not support this contention. Four blacks were seated on the jury which heard the case, and two remained on the deliberating jury which rendered the final verdict. At the time that defense counsel moved for a mistrial on grounds of systematic exclusion, the prosecution had exercised ten peremptory challenges, five of which were used to exclude blacks. The defense had exhausted all of its twenty peremptory challenges, *229 and had excluded two blacks. The prosecution claimed, and the trial court agreed, that these black persons had been excused because of their views towards the death penalty, and not because of race. We agree with the trial judge's conclusion that defendant failed to rebut the presumption that the State had exercised its peremptory challenges on grounds permissible under Art. I, ¶¶ 5, 9 and 10 of the New Jersey Constitution. State v. Gilmore, supra, 103 N.J. at 535.
Our review of the record made at the hearing on the motion to suppress convinces us that the trial judge correctly ruled that Higgins voluntarily consented to a search of his apartment and the objects contained therein, including the plastic garbage bag left in the living room by defendant. While the depositing of such an article in the living room of another without comment probably falls short of abandonment (State v. Farinich, 179 N.J. Super. 1, 8 (App.Div. 1981), aff'd per curiam, 89 N.J. 378 (1982)), Higgins's authority to permit a search of the contents of his own apartment is indisputable. State v. Miller, 179 N.J. Super. 552, 557-559 (App.Div. 1978), certif. den. 78 N.J. 329 (1978). Moreover, it is difficult to conceive that defendant had reason to believe that the contents of this plastic bag, left by him without comment in the living room of another, would remain inviolate. No special steps were taken by defendant to secure this bag and its contents from the scrutiny of others. He had no reasonable expectation of privacy as to the bag's contents. State v. Douglas, 204 N.J. Super. 265, 277-280 (App.Div. 1985), certif. den. 102 N.J. 378 (1985).
The defendant raises the following additional points on appeal:
POINT II  DEFENDANT'S RIGHT TO A FAIR TRIAL WAS PREJUDICED BY THE ADMISSION OF INFLAMMATORY AND CUMULATIVE EVIDENCE AND BY THE ADMISSION OF IRRELEVANT AND INADMISSIBLE HEARSAY.
(A)
THE POLICE TAPE RECORDING WAS IMPROPERLY ADMITTED INTO EVIDENCE.

*230 (B)
NURSE VOELKER-GEIGER'S TESTIMONY WAS IMPROPER.
(C)
DR. KONDO'S TESTIMONY CONCERNING "PAIN" WAS IRRELEVANT AND PREJUDICED DEFENDANT.
(D)
THE CUMULATIVE NATURE OF TESTIMONY CONCERNING THE INJURIES RECEIVED BY THE DECEDENT DENIED DEFENDANT A FAIR TRIAL.
....
POINT V  THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR A NEW TRIAL BECAUSE THE JURY VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE PRESENTED BELOW.
After careful examination of the record, we conclude that these issues are clearly without merit. R. 2:11-3e(2).
Finally, defendant contends that the sentence imposed upon him is "manifestly excessive." The imposition of a life sentence for this brutal killing is beyond challenge. State v. Roth, 95 N.J. 334, 365-367 (1984). However, we find that the thirty-two-year period of parole ineligibility is in excess of that permitted by statute. N.J.S.A. 2C:11-3b specifically provides that when the defendant is convicted of murder, and the death penalty is not sought or imposed, the sentence shall be
... for a term of 30 years during which the person shall not be eligible for parole or to a specific term of years which shall be between 30 years and life imprisonment of which the person shall serve 30 years before being eligible for parole.
The plain language of the statute does not permit a parole ineligibility period in excess of thirty years. We disagree with the State's contention that the Supreme Court has interpreted the statute to permit a life sentence with a parole disqualifier in excess of thirty years. See State v. Biegenwald, 96 N.J. 630, 635 (1984); State v. Grunow, 102 N.J. 133, 137 (1986). We conclude that these opinions interpret the statute to impose a thirty-year period before a defendant sentenced to between thirty years and life can seek parole. These decisions do not *231 authorize the imposition of a parole ineligibility period in excess of thirty years for a person convicted of murder. For this reason, we modify defendant's sentence on the first count to life imprisonment with a thirty year period of parole ineligibility. R. 2:10-3.
Defendant's contention that the sentence imposed constituted cruel and unusual punishment is without merit. R. 2:11-3e(2). See State v. Johnson, 206 N.J. Super. 341, 343 (App.Div. 1986), certif. den. 104 N.J. 382 (1986).
The judgment of conviction is affirmed in all respects, except as to the sentence imposed on the first count of the indictment. The sentence on the first count is modified to provide for the imposition of life imprisonment with a thirty year period before defendant is eligible for parole.
NOTES
[1] Incorrectly designated as N.J.S.A. 2C:39-5b in count three of the indictment. However, the merger at sentencing of this count with the conviction for count two renders harmless what was obviously an inadvertently mis-cited statutory offense.