283 N.J. Super. 269 (1992)
661 A.2d 850
STATE OF NEW JERSEY, PLAINTIFF,
v.
JOHN ARIAS, DEFENDANT.
Superior Court of New Jersey, Law Division Middlesex County.
Decided June 16, 1992.
*272 Thomas Kapsak, Assistant Prosecutor, for the State (Robert W. Gluck, Prosecutor of Middlesex County, attorney).
*273 Edward Byrne, Deputy Public Defender, First Assistant, Middlesex County, for defendant (Wilfredo Caraballo, Public Defender, attorney).
HOFFMAN, J.S.C.
This case of first impression involves a motion to suppress by a person accused of forcibly entering a private residence while armed, murdering a resident thereof, shooting another, and holding a young child hostage for 28 hours.[1] Defendant, John Arias, seeks to suppress evidence seized by the police in the residence after his surrender. The exceptional set of facts encompasses numerous unique issues related to search and seizure.

I. Facts

The facts in this case are basically not in dispute. On Thursday, May 30, 1991, at approximately 3:00 p.m, Linda K. Galbo (Linda) arrived at her home at 36 Roxey Avenue in Edison. As she exited from her car in the garage, Linda was met by the defendant, whom she knew as a former lover. A struggle ensued between the two. During the altercation, Linda's 9-year old brother, John Jr., returned home from school. He called to his mother, Linda M. Galbo (Mrs. Galbo) from the front door, and she rushed to the garage, striking defendant with a mop handle. Defendant then allegedly pushed both Linda and Mrs. Galbo into the house.
According to the State, once inside the Galbo home, defendant allegedly fired an automatic rifle several times, mortally wounding Mrs. Galbo and seriously wounding Linda. The State contends that defendant then handcuffed Linda and put her in the trunk of her car in the attached garage. Linda Galbo managed to escape from the trunk. Meanwhile, John Jr. was handcuffed, bound and gagged inside the house. Edison police and special units arrived at the scene at approximately 3:20 p.m.
*274 The testimony at the suppression hearing revealed the following: Mr. Galbo, the owner of the home, reached Roxey Avenue at approximately 5:30 p.m., to find the street was barricaded. A neighbor informed him that his house had been invaded. Mr. Galbo spoke with police officers at a command post stationed two houses away from his home, and directed police to "do whatever it takes to get [defendant] out of there." Mr. Galbo indicated he wanted to see his family safe, and he wanted the investigators to take any and all evidence necessary to prosecute the defendant once the crisis was over.
It was not until twenty-eight hours after his initial entrance that defendant surrendered. John Jr. was released from the house at 7:15 p.m. Friday, May 31, and defendant was led into a police vehicle. John Jr. informed the police that he had witnessed defendant's attempts to conceal his weapons prior to his surrender.
Police entered the house immediately after defendant was arrested. It was urgent that they find Mrs. Galbo, since they knew she might need medical assistance. However, the police were too late. Mrs. Galbo had died as a result of two gunshot wounds. Her body was found on the entrance foyer floor covered by an afghan and a bedspread. A trail of blood appeared to indicate that her body was dragged to its final resting place.
The police conducted a quick room to room search because they believed the circumstances warranted it. John Jr. was under the mistaken impression that a bomb had been planted in the house.[2] The police were determined to find the bomb if one existed, as well as locate any dangerous weapons defendant had left behind. They found the house in disarray, with broken glass, blood stains, bullet damage, and furniture barricades at the doors. They took pictures and seized numerous items. Defendant concedes that some of these items were immediately visible when the police *275 entered the house. However, defendant asserts, the following seized items could not be classified as items that were plainly seen:
 6 discharged .45 caliber shell casings from a plant to the right of the wall unit in the living room
 1 live .45 caliber round from a plant to the right of the wall unit in the living room
 1 bullet from a loveseat in the living room
 4 bullet fragments from under the carpet in the living room
 1 bullet from under the carpet near the threshold between the kitchen and dining room
 1 bullet from the rear wall cavity of the garage
 1 bullet from the wall cavity between the kitchen and the dining room
 1 bullet from the dining room floor (near garage wall) by the mirror
 2 bullet fragments from the baseboard in the dining room
 ammo magazine containing 7 live .45 caliber rounds from the center drawer of the dresser in the master bedroom.
Defendant, therefore, maintains that these items must be suppressed because they were seized in violation of the Fourth Amendment.

II. Issues

A. Standing

The Fourth Amendment to the Constitution of the United States provides:
The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.
In order to challenge the admission of illegally obtained evidence at trial, a defendant must first prove he has standing to challenge the search or seizure. While the United States Supreme Court has limited standing to defendants who demonstrate they have "a legitimate expectation of privacy" in the place searched or the item seized (Rawlings v. Kentucky, 448 U.S. 98, 104, 100 S.Ct. 2556, 65 L.Ed.2d 633 (1980)), New Jersey has afforded its citizens even broader protection against unreasonable search and seizure. State v. Alston, 88 N.J. 211, 440 A.2d 1311 (1981).
*276 Undoubtedly, states have the power to give broader individual liberties under their constitutions than those enforced by the United States Constitution. PruneYard Shopping Center v. Robins, 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980). The Supreme Court of New Jersey may provide greater shelter to its residents from unreasonable searches and seizures than that supplied by the United States Supreme Court. State v. Johnson, 68 N.J. 349, 353, 346 A.2d 66 (1975). Although the United States Supreme Court has predicated standing on a showing of a "legitimate expectation of privacy" when a violation of the Fourth Amendment has occurred, New Jersey has taken a different approach in interpreting the same language under its state constitution. See N.J. Const. art. 1, par. 7.
In Alston, supra, 88 N.J. 211, 440 A.2d 1311 the New Jersey Supreme Court ruled that the accused defendant need only have a "proprietary, possessory or participatory interest" in either the place searched or the property seized to claim standing to contest that Fourth Amendment rights were violated. Despite this apparently liberal view of standing, neither case nor commentary has catalogued the contents of the phrase. State v. Curry, 109 N.J. 1, 9, 532 A.2d 721 (1987). However, according to State v. Mollica, 114 N.J. 329, 339-40, 554 A.2d 1315 (1989), "participatory" connotes some involvement in the underlying criminal conduct in which the seized evidence is used by the participants to carry out the unlawful activity. Additionally, New Jersey has retained "automatic standing" for possessory offenses, a concept rejected with regard to federal Fourth Amendment cases in United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).
Under the test enunciated in State v. Alston, supra, it is difficult to envision a scenario in which a defendant would not have a "proprietary, possessory or participatory interest" in the place searched or item seized. Yet, the New Jersey Supreme Court has not granted "automatic standing" except for possessory offenses. This would seem to imply that under certain circumstances, a defendant would not have standing. If there is a residuum of *277 circumstances where a defendant has no standing, this case must be the situation. In the case at bar, defendant intruded upon a peaceful home, bringing with him an assault rifle, an electronic stun gun, a B.B. pistol, handcuffs, and a knife. He is alleged to have killed Mrs. Galbo, shot Linda Galbo, cuffed and gagged John, Jr., and then hidden his weapons in the Galbo home prior to surrendering from the twenty-eight hour hostage situation. In short, defendant was the "ultimate uninvited guest." Did the framers of the Constitution actually want to protect this type of defendant when they drafted the Fourth Amendment? Did the Supreme Court of New Jersey intend to so broadly construe the Fourth Amendment so that defendant and others similarly situated would have the right to challenge seizures made under these circumstances? This seems unlikely.
It should be noted that Justice Schreiber, in a separate opinion in Alston, supra, expressed that "the majority has unnecessarily interpreted New Jersey's constitutional search and seizure provision so that it serves to afford a windfall to defendants whose Fourth Amendment rights have not been violated." 88 N.J. at 235, 440 A.2d 1311. Defendant's challenge here certainly illustrates that "windfall."[3] However, Justice Schreiber's view did not prevail, and under the majority holding of Alston, I must reluctantly hold that this defendant has standing.[4]

B. Was There a Search?  The Reasonable Expectation of Privacy Standard.
Although the broad language of Alston virtually compels standing, this merely gives defendant the right to challenge searches *278 and seizures made. The next area of inquiry is whether the protections of the Fourth Amendment inure to this defendant. This requires an analysis of whether the defendant had a reasonable expectation of privacy.
New Jersey caselaw has defined "search" as "an invasion, a quest with some sort of force, either actual or constructive." State v. Roman, 182 N.J. Super. 297, 299, 440 A.2d 1155 (App.Div. 1982), certif. denied, 89 N.J. 431 (1982) (citations omitted); accord State v. Bates, 202 N.J. Super. 416, 495 A.2d 422 (App.Div. 1985). Additionally, "[a] search implies some exploratory investigation and prying into hidden places for that which is concealed." State v. Anglada, 144 N.J. Super. 358, 361, 365 A.2d 720 (App.Div. 1976); see also State v. Griffin, 84 N.J. Super. 508, 517, 202 A.2d 856 (App.Div. 1964); State v. Stroger, 185 N.J. Super. 124, 447 A.2d 598 (Law Div. 1981); accord Bates, supra. However, perhaps most telling is the explanation that a "search" occurs when the privacy expectation that has been infringed upon, is one that society is prepared to consider reasonable. Bates, supra, 202 N.J. Super. at 426, 495 A.2d 422 (citing U.S. v. Jacobsen, 466 U.S. 109, 113, 104 S.Ct. 1652, 1656, 80 L.Ed.2d 85, 94 (1984); United States v. Dionisio, 410 U.S. 1, 8, 93 S.Ct. 764, 768, 35 L.Ed.2d 67 (1973); Terry v. Ohio, 392 U.S. 1, 9, 88 S.Ct. 1868, 1873, 20 L.Ed.2d 889 (1968)).
In the instant case, defendant did not own or rent the premises located at 36 Roxey Avenue, nor was he an overnight guest, a welcome visitor, or inadvertent trespasser. Yet, defendant contends he has a "reasonable expectation of privacy" in his items which were found in the home of those he held captive for twenty-eight hours. Since the New Jersey Constitution merely requires that an expectation of privacy be reasonable, and does not take into account one's subjective idea of what constitutes "reasonable,"[5] social norms establish the *279 tandard.[6] Would society believe this defendant had an expectation of privacy that the Fourth Amendment was designed to protect?
In the past, courts have dealt with the reasonable expectation of privacy issue by couching it in "abandonment terms." See, e.g., State v. Farinich, 179 N.J. Super. 1, 430 A.2d 233 (App.Div. 1981); see also State v. Burgos, 185 N.J. Super. 424, 449 A.2d 536 (App.Div. 1982). Rather than concluding that defendant had no reasonable expectation of privacy in a particular area searched or item seized, the courts have rationalized decisions by relying on the theory that defendant had "abandoned" the item seized.
"Abandonment" is defined as "the voluntary relinquishment of all right, title, claim and possession, with the intention of not reclaiming it." State v. Farinich, supra, 179 N.J. Super. at 56, 430 A.2d 233 (quoting Black's Law Dictionary 13 (4th ed. 1957)). For Fourth Amendment purposes, a defendant is said to have "abandoned" property when he or she
voluntarily discards, leaves behind or otherwise relinquishes his [or her] interest in the property in question so that he [or she] can no longer retain a reasonable expectation of privacy with regard to it at the time of the search.
[Id., at 6 (citing United States v. Colbert, 474 F.2d 174, 176 (5th Cir.1973)).]
In Farinich, defendants were approached by police officers who wanted to speak to them about their suitcases, and upon hearing this, defendants dropped their suitcases and fled. The Court said that by dropping the bags, the defendants had abandoned them, thereby relinquishing any expectation of privacy they might have had in them. Id., at 4-5, 430 A.2d 233.[7]
*280 The Appellate Division has acknowledged "another variation on the recognized theme of abandonment of personal property for purposes of constitutionally protected privacy" in State v. Burgos, 185 N.J Super. 424, 427, 449 A.2d 536 (App.Div. 1982). There, police watched defendant place an aspirin tin of narcotics on the ground below an automobile on a public street. After viewing what they believed to be three separate drug transactions, one of the officers retrieved the aspirin case from underneath the car. In finding an "abandonment," the appellate court held that "defendant had no protected Fourth Amendment rights in the narcotics stash maintained remotely from his person." Id. at 426-27, 430 A.2d 233.
Like Farinich and Burgos, this court could rely on "abandonment" in order to find defendant had no reasonable expectation of privacy, and to hold that no Fourth Amendment "search" occurred. However, those cases pre-dated State v. Hempele, 120 N.J. 182, 576 A.2d 793 (1990). In Hempele, the Supreme Court recognized that the use of "abandonment" in search and seizure cases has made the issue of reasonable expectation of privacy nebulous, and asked that our courts refrain from utilizing "abandonment."
Post-Hempele cases have analyzed the issue in terms of a reasonable expectation of privacy. State v. Lee, 245 N.J Super. 441, 586 A.2d 256 (App.Div. 1991), may be viewed as a "bridge" case holding that the reasonable expectation of privacy, rather than the object, was abandoned. In Lee, defendant was a passenger in a car owned by his co-defendant, who was also driving the car. Police pulled the car over when they saw the car speeding. Upon realizing that the license plate on the car actually belonged on another vehicle, and perceiving co-defendant as nervous, the police officers requested consent to search the car. During the search, police uncovered a zippered shaving kit. When asked by *281 the officers to whom it belonged, both defendant and co-defendant said they did not know. The court found that "even if there was no consent [by defendant], Lee relinquished any expectation of privacy he might have had in the kit when he disclaimed ownership or any interest in it." Id. at 449, 586 A.2d 256 (emphasis added). The court acknowledged that where there is no reasonable expectation of privacy, there is no "search," and concluded that defendant had no reasonable expectation of privacy. Id. at 451-52, 586 A.2d 256.
In another post-Hempele case, State v. Lugo, 249 N.J. Super. 565, 592 A.2d 1234 (App.Div. 1991), the Appellate Division encountered facts similar to those presented in the case at bar. In Lugo, supra, police conducted a warrantless search of a stolen automobile driven by defendant. A brown bag containing contraband was seized. The court in Lugo ruled that "[a] defendant operating an automobile known by him to have been stolen has no reasonable expectation of privacy respecting contraband he has hidden in it  no matter how the contraband is packaged." Id. at 568, 592 A.2d 1234. The same logic must apply when defendant hides evidence of criminality in a house he illegally entered. Society would not readily accept that defendant's privacy was disturbed.
The facts here clearly show that defendant has no reasonable expectation of privacy in effects left in a home that he commandeered at gunpoint. Since there was no reasonable expectation of privacy in the property, I hold that there was no "search" implicating Fourth Amendment protections. Thus, the motion to suppress the fruits of a warrantless search is denied on this basis alone. However, for purposes of appellate review I will also explore whether certain "exceptions" to the Fourth Amendment warrant requirement apply. I will now analyze the facts of this case in relationship to these exceptions.

C. Exigent Circumstances and Plain View

Defendant concedes that police lawfully entered the residence without a warrant due to exigent circumstances; i.e., Mrs. *282 Galbo had been shot. The exigent circumstances exception to the warrant requirement is appropriately used when grave danger to the police or the public obviates the need for a warrant. See, e.g., Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); see also State v. Hutchins, 116 N.J. 457, 561 A.2d 1142 (1989); State v. Wright, 213 N.J. Super. 291, 517 A.2d 171 (App. Div. 1986). In State v. Leandry, 151 N.J. Super. 92, 376 A.2d 574 (App.Div. 1977), a case in which police had reason to believe someone had been shot, the court expressed:
The calm deliberation which is characteristic of the judicial process is not to be reasonably expected in the face of an emergent situation. The need to protect and preserve life must be given precedence in our order of priorities. We cannot say that the entry of the police under the reasonable belief that a person who had been shot was in the premises was unlawful.
[Id. at 96-97, 376 A.2d 574.]
Defendant recognizes the right of the police to conduct a room to room search upon entry and to seize evidence in plain view, since the police had received information that a woman had been shot. However, defendant asserts that once police found no medical emergency existed because Mrs. Galbo was already deceased, a warrant was required to search for those items not in plain view.
The U.S. Supreme Court reviewed the plain view exception in Texas v. Brown, 460 U.S. 730, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983). In order for the exception to apply, three requirements must be satisfied: 1) the police officer must be lawfully in the viewing area; 2) the officer must discover the incriminating evidence inadvertently; and 3) there must be probable cause to associate the evidence with criminal activity. Ibid.[8] Defendant is correct in his determination that those items hidden by defendant *283 were not in plain view. However, despite defendant's opposing belief, bullets and bullet fragments that were found in the wall, loveseat, underneath the carpet, and in the baseboard were in plain view. The bullet holes were visible to the naked eye, and police were entitled to follow them to retrieve the bullets. This was not "a search" because once police observed the holes, defendant had no reasonable expectation of privacy in the bullets.
Furthermore, walls, furniture and plants may be analogized to containers. Logically, "[s]ome containers ... by their very nature cannot support any reasonable expectation of privacy because their contents can be inferred from their outward appearance." State v. Demeter, 124 N.J. 374, 590 A.2d 1179 (1991) (quoting United States v. Eschweiler, 745 F.2d. 435, 440 (7th Cir.1984)). It is apparent that when police followed a hole in the wall cavity, loveseat, floor or baseboard, they did not trample on Fourth Amendment rights. Accordingly, I hold the search valid under exigent circumstances and plain view exceptions.

D. Consent

Assuming that a Fourth Amendment warrantless "search" had taken place, the search was still valid. As discussed above, defendant had no interest in 36 Roxey Avenue; he was not an owner, occupant, or guest. The actual owners and occupants of the house were John Galbo, Sr. and Mrs. Linda Galbo.
According to Mr. Galbo, who testified at the suppression hearing, he attempted to drive to his house down Roxey Avenue at approximately 5:30 p.m., but found a barricade there. At that time, Mr. Galbo learned from a neighbor that his home had been taken over. Mr. Galbo spoke with the police at a command post stationed two houses away. Mr. Galbo testified that after talking with Sgt. Westover and other officers, and telling police that the man in the house was John Arias who was there without permission, he told police that they had "carte blanche," and they should "do whatever it takes to get him out of there." Mr. Galbo said he *284 asked the police to get Arias out of his house, and then take all the evidence they needed to prosecute.
Another exception to the warrant requirement is consent. U.S. v. Matlock, 415 U.S. 164. 94 S.Ct. 988, 39 L.Ed.2d 242 (1974); accord State v. Douglas, 204 N.J. Super. 265, 498 A.2d 364 (App.Div. 1985). Such consent may be either express or implied from the circumstances.[9]State v. Koedatich, 112 N.J. 225, 262, 548 A.2d 939 (1988). A third party, other than the defendant may consent to a search as long as the third party has the authority to give consent. See State v. Miller, 159 N.J. Super. 552, 558-59, 388 A.2d 993 (App.Div. 1978), certif. denied, 78 N.J. 329, 395 A.2d 198 (1978); State v. Douglas, supra; State v. Thomas, 224 N.J. Super. 221, 540 A.2d 196 (App.Div. 1988) (where brother's consent to search of defendant's garbage bag left in brother's home was valid since defendant had no reasonable expectation of privacy). In the instant case, Mr. Galbo, the owner and occupant of the home, was consenting to the warrantless search when he told the police to do whatever they had to do in order to capture Arias and prosecute him. Without hesitation, Mr. Galbo gave the go ahead to the police to throw rocks at the house, break some windows or head toward the house with trucks, if such action was necessary. Mr. Galbo put no restrictions on the police; they were authorized to enter the house in any way they could, and take whatever evidence they discovered in the house. Obviously, Mr. Galbo's consent was freely and voluntarily given (See Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), on remand, 479 F.2d 1047 (9th Cir.1973)); he was anxious to have his home and family back, and to see the defendant incarcerated. Since Mr. Galbo validly consented to the search, it was irrelevant that defendant did not consent. See State v. Miller, supra. It is readily apparent that Mr. Galbo, the homeowner, possessed the *285 authority to consent to the warrantless search.[10] I hold that Mr. Galbo did legally consent to the search, and that any items seized were obtained through valid consent.

E. Inevitable Discovery

In addition to the consent, plain view, and exigent circumstances exceptions, the warrantless search was lawful under the inevitable discovery doctrine.[11] The principle of inevitable discovery was first applied by the New Jersey Supreme Court in State v. Sugar (II), 100 N.J. 214, 495 A.2d 90 (1984).[12] There, the Supreme Court established standards the state must meet in order to qualify for the exception. The requirements are as follows:
1. proper, normal and specific investigatory procedures would have been pursued in order to complete investigation of the case;
2. under all the surrounding relevant circumstances the pursuit of those procedures would have inevitably resulted in discovery of the evidence; and
3. the discovery of the evidence through those procedures would have occurred wholly independently of such evidence by unlawful means.
The Supreme Court later extended the inevitable discovery exception to include discovery by third parties, parties other than the *286 police. State v. Sugar (III), 108 N.J. 151, 157, 527 A.2d 1377 (1987).
In applying the conditions set forth in Sugar (II) and Sugar (III), I find that the police would have later uncovered the evidence taken by police on May 31, 1991. In Sugar, a far more compelling case for the defendant, the Supreme Court concluded the inevitable discovery doctrine was applicable. There, police dug up a body in the ground underneath a picnic table at defendant's home. Dr. Sugar, the defendant, had sold the home and property to other persons after his wife's death. The Court, in Sugar III, decided that the new owners would soon have found the grave. Therefore, the body was admitted as evidence under the inevitable discovery theory.
In the instant matter, Mr. Galbo was cooperative with authorities throughout the entire investigation. After the incident, Mr. Galbo returned to his home to gather belongings. Certainly, he would have seen this evidence at that time, and turn it over to the police. However, even if Mr. Galbo had not uncovered the bullet holes, fragments, and ammunition, the new owner of the house could not ignore these obvious oddities. Inevitably, the crime scene follow-up investigation by the police, either at Mr. Galbo's invitation or permission, or through other legal authority, would have led to the discovery and seizure of evidence left inside the Galbo house. In essence, I hold that there is clear and convincing evidence that the state did not benefit from the warrantless search and seizure. Since the police would have later retrieved the same evidence, it will not be suppressed.

III. Conclusion

For the above stated reasons, the motion to suppress is denied.
NOTES
[1] The State is seeking the death penalty.
[2] Police later concluded that the "bomb" was actually a stun gun located on the bed in the master bedroom.
[3] Significantly, defendants in Alston, supra, were invited passengers in an automobile. Moreover, there is no New Jersey case law on standing to challenge a warrantless search and seizure where the defendant had intruded upon someone else's private property.
[4] However, I have addressed this issue so that an appellate court might review this area of the law to determine if this state has automatic standing for all purposes.
[5] State v. Hempele, 120 N.J. 182, 198, 576 A.2d 793 (1990); see also State v. Marshall, 123 N.J. 1, 66-67, 586 A.2d 85 (1991) (quoting Katz v. United States, 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576, 588 (Harlan, J. concurring)).
[6] State v. Hempele, 120 N.J. 182, 198, 576 A.2d 793 (1990).
[7] Cf. State v. Ellis, 246 N.J. Super. 72, 586 A.2d 876 (Law Div. 1990), where the defendants put down their luggage "momentarily" after police approached them, and the court found that defendant's silence and non-objection to his co-defendant's statement, "they're not our bags," along with his failure to object to the search, constituted a valid consent.
[8] However, since State v. Bruzzese, 94 N.J. 210, 463 A.2d 320 (1983), the inadvertence requirement is of doubtful application in New Jersey. The Court in Bruzzese decided that using a subjective test "... is a poor way to distinguish which defendants subject to identical intrusions on their privacy shall receive the constitutional benefit of the exclusionary rule." Id. at 222-23, 463 A.2d 320 (footnote omitted).
[9] See, e.g., n. 7.
[10] Although State v. Pierce, 190 N.J. Super. 408, 463 A.2d 977 (App.Div. 1983), held that a search of a car consented to by one having control of the car does not necessarily permit the search of private property of another found in a car, the items belonging to the defendant in Pierce were located in a brown bag, i.e., a container, which was not the case here. Thus, the court found defendant had a reasonable expectation of privacy in his effects due to the specific container despite the co-defendant's consent. However, even if the evidence in the instant case had been discovered in a container or package, State v. Lugo, 249 N.J. Super. 565, 592 A.2d 1234 (App.Div. 1991), discussed supra, indicates defendant would not have a reasonable expectation of privacy.
[11] This exception was first defined in Nix v. Williams, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).
[12] The doctrine of inevitable discovery was first acknowledged, but not utilized, in State v. Ercolano, 79 N.J. 25, 58-59, n. 3, 397 A.2d 1062 (1979) (Schreiber, J. dissenting), and finds its genesis in cases such as Government of the Virgin Islands v. Gereau, 502 F.2d 914 (3rd. Cir.1974).